**THE COALITION FOR THE PRESER- VATION OF AMERICAN BRAKE DRUM AND ROTOR AFTERMARKET MANUFACTURERS, Plaintiff,**

v.

**The UNITED STATES of America, Defendant, China National Automotive Indus. Import & Export Co., Qingdao Metal Minerals & Machinery Import & Export Corp., Yantai Import & Export Corp., Longkou Bohai Machinery Co., Beijing Xinchangyuan Automobile Fittings Corp., China National Machinery Import & Export Corp., Hebei Metals and Machinery Import & Export Corp.,**

**Shanxi Machinery and Equipment Import & Export Corp., China North Industries Corp. (Guangzhou), China North Industries Corp. (Dalian), Longjing Walking Tractor Works Foreign Trade Import & Export Corp., Changzhi Automotive Parts Factory, and Southwest Technical Import & Export Corp., Defendant–Intervenors, California Brake Drum and Rotor, Defendant–Intervenor.**

Slip Op. 98–80.
No. 97–05–00876.

United States Court of
International Trade.

July 13, 1998.

Porter, Wright, Morris & Arthur, Washington, DC (Leslie Alan Glick), for Plaintiff.

Lyn M. Schlitt, General Counsel, James A. Toupin, Deputy General Counsel, Office of the General Counsel, U.S. International Trade Commission (Marc A. Bernstein), Washington, DC, for Defendant.

White & Case, Washington, DC (William J. Clinton and Adams C. Lee) for Defendant–Intervenors, China National Automotive Indus. Import & Export Co., et al.

Williams Mullen Christian & Dobbins (William E. Perry, Thomas B. McVey, and W. David Snead), Washington, DC, for Defen-

dant–Intervenor, California Brake Drum and Rotor.

### *OPINION*

WALLACH, Judge:

#### I

#### INTRODUCTION

Plaintiff, the Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers (the "Coalition")[1], moves pursuant to Rule 56.2 of the Rules of this Court to challenge the final negative determination of the United States International Trade Commission ("ITC" or "Commission") that a domestic industry is not being materially injured or threatened with material injury by reason of imports of certain brake drums from China. The International Trade Administration of the Department of Commerce ("ITA" or "Commerce") found that they were being sold in the United States at less than fair value ("LTFV"). Jurisdiction is predicated upon 28 U.S.C. § 1581 (1994). For the reasons that follow, the Commission's final determination is sustained.

#### II

#### BACKGROUND

On March 7, 1996, the Coalition filed an antidumping duty petition with the ITA and ITC.[2] The petition alleged that certain brake drums and rotors from the People's Republic of China ("PRC" or "China") were being dumped in the United States at LTFV and were causing material injury and/or threat of material injury to a United States industry. The period of investigation ("POI") covers the years 1993 through 1996.

On February 28, 1997, Commerce announced its final antidumping duty determination. It found that certain brake drums and rotors were being sold in the United States at LTFV. *Notice of Final Determinations of Sales at LTFV: Brake Drums and Brake Rotors from the People's Republic of*

---

1. The Coalition is composed of the following companies: Brake Parts, Inc., McHenry Il.; Kinetic Parts Manufacturing, Inc., Harbor City, CA; Iroquois Tool Systems, Inc., Northeast PA; and Wagner Brake Corp., St. Louis, MO.

2. Plaintiff brings this action pursuant to section 773 of the Tariff Act of 1930 ("Tariff Act") as amended by the Uruguay Round Agreement Act ("URAA"), Pub.L.No. 103–465 (1994) as the investigation was initiated after the effective date, January 1, 1995.

*China*, 62 Fed.Reg. 9160 (Feb. 28, 1997). Commerce published its final amended affirmative determination on April 2, 1997. *Notice of Amended Final Determination of Sales at LTFV: Brake Drums and Brake Rotors from the People's Republic of China*, 62 Fed.Reg. 15,655 (April 2, 1997).

On April 16, 1997, the Commission issued its final determination. In a unanimous decision concerning the brake drums, the Commission found that a United States industry was not being materially injured nor threatened with material injury by reason of imports of certain brake drums from China.[3] In contrast, the Commission made an affirmative injury determination concerning certain brake rotors. *Certain Brake Drums and Rotors from China*, Inv. No. 731–TA–744 (Final), USITC Pub. 3035 ("Final Determination"); 62 Fed.Reg. 18,650 (ITC April 16, 1997). The determination concerning the brake rotors is not being challenged here.

## III

## STANDARD OF REVIEW

■ In reviewing the Commission's determination, this Court must sustain a final negative injury determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(1994). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (citation omitted). Moreover, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elect. Indus. Co. Ltd. v. United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (Fed.Cir.1984) (citation omitted).

■ The reviewing court may not, "even as to matters not requiring expertise ... displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In this regard "the court may not reweigh the evidence or substitute its judgment for that of the ITC." *Dastech Int'l, Inc. v. USITC*, 963 F.Supp. 1220, 1222 (CIT 1997); *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 8 Fed. Cir. (T) 36, 894 F.2d 385 (1990).

## IV

## DISCUSSION

In order to make a final affirmative determination in its injury investigation, the ITC must find that:

(A) an industry in the United States

 (i) is materially injured, or

 (ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded, by reason of imports of the merchandise....

19 U.S.C. § 1671b(a)(1)(1994). With respect to LTFV imports, "material injury" is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A)(1994).

## A

The ITC's Determination That The Domestic Brake Drum Industry Was Not Being Materially Injured By Reason Of LTFV Imports Is Supported By Substantial Evidence

■ Plaintiff argues that the ITC determination is unsupported by substantial evidence

---

3. Chairman Miller and Vice Chairman Bragg joined in the analysis of the Final Determination. Commissioner Crawford joined in only the factual "Views of the Commission" as to volume of imports of brake drums. Although she concurred in her colleagues' conclusion regarding significance of imports, price effects and impact, she provided her own individual analysis. *See Final Determination* at nn. 117, 124, 125.

Commissioner Newquist did not join in section V's discussion of material injury of the Final Determination. He determined that the domestic drum industry is not experiencing material injury, and thus did not need to reach the issue of causation. *Final Determination* at n. 141.

in the record and contrary to law with regard to its finding of no material injury. Plaintiff contends that the ITC failed to consider evidence in the record on the volume of imports and their consequential and harmful impact on the U.S. industry. Accordingly, Plaintiff requests a reversal of the ITC's Final Determination or in the alternative, a remand to the ITC for further proceedings.

Defendant, United States, and Defendant–Intervenors, China National Automotive Indus., *et al.* ("China National"), and California Brake Drum and Rotor respond that the Commission's conclusions have the requisite evidentiary support, that no factual issues are in dispute and that the Coalition is, in reality, asking the Court to impermissibly reweigh the evidence.

The guidelines established by Congress for analyzing the issue of material injury mandate consideration of the following factors: (1) the volume of imports, (2) the effect of imports of that merchandise on prices in the United States for like products, and (3) the impact of such merchandise on domestic producers of like products. 19 U.S.C. § 1677(7)(B)(i)(1994); *Angus Chemical Co. v. United States*, 140 F.3d 1478, 1484 (Fed.Cir. 1998) (three mandatory factors). Pursuant to 19 U.S.C. § 1677(7)(B)(ii), the Commission may also "consider such other economic factors as are relevant to the determination." No single factor, however, is determinative and the Commission evaluates all relevant economic factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii)(1994); *Companhia Paulista De Ferro–Ligas v. United States*, Slip Op. 96–63, 18 ITRD1542, ——, 1996 WL 189515, *3 (CIT 1996).

■ In evaluating the evidence it collects during the investigation, the "commissioners are free to attach different weight to the various statutory tests which they are required to employ when evaluating the pres-

ence or threat of injury." *U.S. Steel Group v. United States*, 96 F.3d 1352, 1362 (Fed.Cir. 1996).

■ A finding of an affirmative injury determination requires both "(1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719 (Fed.Cir.1997). "Evidence of de minimis (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute." *Id.* at 722.

1

Substantial Evidence Supports the Commission's
Determination That The Volume of Imports Lacked Significance

19 U.S.C. § 1677(7)(C)(i) directs the Commission, in evaluating the volume of imports, to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."

In the *Final Determination*, the ITC found that the quantity of LTFV brake drum imports rose from zero in 1993 to 333,000 units ($3.4 million) in 1994, then rose to 494,000 units ($4.8 million) in 1995. *Final Determination* at 20. For interim 1996,[4] the ITC found the quantity of subject drum imports fell to 339,000 units ($2.9 million) which amounted to fewer than the 456,000 units ($4.4 million) imported in interim 1995.[5] *Id.* The ITC also found the subject drum market penetration grew from 0 in 1993 to 7.6% in 1994 and then to 9.2% in 1995. In interim 1996, a market penetration of 7.5% amounted to less than a market penetration of 10.9% calculated for interim 1995. *Id.* at 21. The Commission additionally found that the domestic market share, on the other hand,

---

4. The interim period covers January through September.

5. Plaintiff refers to this finding as the "domestic aftermarket drum industry's *alleged* substantial increase in capacity," capacity utilization and

increase in demand, Plaintiff's Rule 56.2 Motion For Judgement Upon the Agency Record at 10 ("Plaintiff's Brief") (emphasis added), yet, does not raise a dispute over the factual accuracy of the ITC's finding.

"varied little throughout most of the period of investigation." *Id.* at 14.[6]

Plaintiff makes two arguments for its contention that the ITC erred in its analysis of subject import volume. First, it argues that the ITC erroneously concluded that the import volume of LTFV brake drums was not "significant." Plaintiff's Brief at 8. Second, Plaintiff maintains that the ITC failed to analyze the relationship between the import volume and conditions and trends in the marketplace. *Id.* at 10.

■ To support its claim that the ITC erroneously concluded the subject import volume was not significant, Plaintiff cites to other cases and Commission determinations where the ITC found a market penetration of less than 7.5% and made a material injury finding. Plaintiff asserts that "[c]learly market penetration levels of 7.4% to 9.2% are not insignificant as a matter of law." *Id.* To the extent that Plaintiff's argument rests on the theory that the level of market penetration in this case amounts to a *per se* finding of significance, its argument is flawed.

■ Reviewing the record as a whole as is required, "[f]or one industry, an apparently small volume of imports may have a significant impact on the market; for another the same volume might not be significant." S.Rep. No. 96–249, at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474. Accordingly, "it is the significance of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." *USX v. United States*, 11 CIT 82, 85, 655 F.Supp. 487, 490 (1987).[7] Therefore, a market penetration level of 7.5% does not mandate a conclusion that volume levels are significant.

■ Plaintiff also argues that this case presents the same issue addressed in the *USX Corp. v. United States* line of cases[8] where the Court ordered a remand to the ITC because the determinations were found to be insufficient and lacking in explanation. In this regard, Plaintiff claims that the ITC "relied heavily upon the volume of the subject imports, which increase in 1994 and 1995", only discussing "briefly" the increase in the domestic industry's productivity factors and taking a "cursory" look at the domestic industry's market share. Plaintiff's Brief at 10.

Here, the Commission, however, completed a thorough analysis, and on that basis, could not conclude that the subject import volume was "significant". *Final Determination* at 21. The ITC found that despite the increase in volume and market penetration of LTFV imports from 1993 to 1995, the U.S. domestic industry simultaneously increased its production, shipments, capacity and capacity utilization while the domestic industry's market share remained relatively stable.[9] Therefore, the ITC reasoned that the "U.S. pro-

---

6. Domestic market share ranged from 53.1% in 1993 to 50.3% in 1995. Interim 1996 market share of 43.7% was less than an interim 1995 share of 49.4%.

7. Although not essential to its argument given the prevailing case law, the government, in contrast to plaintiff's assertions, points to cases and ITC determinations where a market penetration of more than 7.5% was found and the ITC still concluded that the volume of imports was not significant. *See e.g., Floral Trade Council v. United States*, Slip Op. 96–78 at 4–6, 1996 WL 276957 (CIT 1996) (market share increased from 46.1 to 56% ); *Manganese Sulfate from the People's Republic of China*, Inv. No. 731–TA725 (Final), USITC Pub. 2932 at 11–12 (Nov.1995) (market penetration of 20.3% and no material injury).

8. *See USX Corp. v. United States*, 11 CIT 82, 655 F.Supp. 487 (1987) (remanding case to ITC because analysis contained only conclusory statement that market penetration levels remained low and unstable); *USX Corp. v. United States*, 12 CIT 205, 682 F.Supp. 60 (1988) (second determination found insufficient because conclusory statement regarding market penetration did not address "how volume of imports relates to injury"); *USX Corp. v. United States*, 12 CIT 844, 847, 698 F.Supp. 234, 238 (upholding determination since ITC analyzed the relationship of import volume to conditions and trends in the marketplace).

9. Production rose from 2 million in 1993 to 2.9 million units in 1995 (an increase of 44.1%) although interim 1996 production of 2 million units amounted to slightly less than interim 1995 production of 2.1 million (a decrease of 5.1%). Shipments grew from $35.1 million in 1993 to $47.4 million in 1995 (35.2% increase). Interim 1996 shipments of $35.7 million were also slightly less than the $36.3 million shipped in interim 1995. Capacity also rose from 2,968 in 1993 to 3,168 in 1994 then to 3,418 in 1995 (1,000 units). Similarly, capacity utilization rose from 67.6% in

ducers maintained their predominant market presence" during the period 1993 to 1995. *Final Determination* at 21. Similarly, for interim 1996, the Commission concluded that the decrease in production, shipments, capacity utilization, and market share of the U.S. industry did not correlate with subject import volumes since such imports actually decreased in volume and market share during the same time. *Id.*

Moreover, "[b]ecause the increase in shipments was nearly as great as the increase in domestic consumption, U.S. producers' market share varied little throughout most of the period of investigation." *Final Determination* at 14. Reflecting the increase in shipments, sales revenues also rose for the domestic industry from "$43.7 million in 1993 to $49.5 million in 1994 and $52.1 million in 1995, an increase of 19.2 percent from 1993 to 1995." *Id.*

This case is plainly distinguishable from the holding in the *USX* cases where the ITC determinations were unsubstantiated. Substantial evidence supports the Commissioners' findings that the subject import volume was insignificant. More importantly, based on the facts in the record, the Commission quite reasonably concluded that the volume of subject imports lacked significance since they did not prevent the domestic industry from maintaining its predominant market presence.

### 2

The Commission Reasonably Concluded That The
LTFV Imports Did Not Affect Domestic Prices

The Commission must consider whether imports affect prices. It examines if:

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii)(1994).

In its analysis of price effects, the Commission acknowledged that "[p]roducers' prices for domestically-produced aftermarket drums generally declined during the period of investigation" and that "the subject imports undersold the domestic like product in every producer price comparison." *Final Determination* at 21. Nevertheless, the Commission decided to give this evidence limited weight since it could not find the requisite nexus between the pricing of the subject imports and the domestic industry's operating performance. *Final Determination* at 22–23.[10]

Plaintiff challenges this analysis arguing that the "*consistent pattern of underselling ... should be the single most significant factor in an injury determination antidumping cases.*" Plaintiff's Brief at 12 (emphasis in original). Plaintiff argues the ITC disregarded the consistent pattern of underselling and that therefore its determination is not in accordance with law. *Id.*[11]

■ To the extent plaintiff argues that evidence of underselling is a *per se* indication of injury, its argument fails. "Evidence of

---

1993 to 79.8% in 1994 then to 84.6% in 1995. *Final Determination* at 14.

**10.** Other factors found in the record and unrelated to subject imports indicated alternative reasons for decreases in U.S. price. For example, as Defendant–Intervenors, China National note, the recent growth of programmed distribution groups ("PDGs"), associations of warehouse distributors banded together to combine purchasing power, enable a warehouse distributor "to obtain better prices than it could by acting alone." Defendant–Intervenors' Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency

Record at 10–11 (quoting *Final Determination* at I–8, I–9).

**11.** For support, plaintiff cites to cases and determinations where injury was found based on consistent, mixed and sporadic underselling. These cases only embody the legislative intent that the significance of various factors affecting an industry necessarily depend upon the facts of each case, *see Copperweld Corp. v. United States*, 12 CIT 148, 161, 682 F.Supp. 552, 565 (1988), and do not lend credence to Plaintiff's claim that evidence of underselling is a *per se* indicator of material injury.

underselling alone is legally insufficient to support an affirmative injury determination." *BIC Corp. v. United States,* 964 F.Supp. 391, 401 (CIT 1997), *aff'd* App. No. 97–1443 (Fed. Cir. March 11, 1998). "Rather, the Commission has a statutory mandate to consider not only whether the subject imports have significantly undersold the domestic like product, but also how the subject imports effect the prices of the domestic like product." *Id.; see also Trent Tube Div. v. United States,* 14 CIT 386, 402, 741 F.Supp. 921, 935 (1990) (according less weight to underselling).

As noted earlier, the ITC has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis. *See Maine Potato Council v. United States,* 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). "The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide." S.Rep. No. 249, at 88 (1979) *reprinted in* 1979 U.S.C.C.A.N. 381, 474. Accordingly, plaintiff's assertion that the consistent pattern of underselling "should be the single most significant factor" is erroneous. The Court finds reasonable the ITC's analysis and weight attributed to the factors and evidence presented in the record.

Here, the ITC did not neglect the underselling evidence,[12] but determined that "any price pressure that the subject imports may have placed on the domestic aftermarket drum industry was insufficient to seriously erode the domestic industry's operation margins or to preclude it from earning larger profits during the latter portions of the period of investigation than at its inception." *Final Determination* at 22–23. This conclusion was specifically buttressed by the evidence in the record which revealed a substantial increase in operating income during the latter half of the investigation despite simultaneous increases in subject import volume and market penetration.[13] Although operating income declined from 1993 to 1994, when the subject imports were first introduced, the ITC determined that "any negative effects on the domestic aftermarket drum industry from the initial increase in subject imports were not evident by the conclusion of the [POI]." *Id.* at 23. Therefore, the Court finds that the Commission's determination that there was no nexus between pricing of the LTFV imports and the domestic industry's operating performance was supported by substantial evidence.

Plaintiff also asserts that the ITC did not consider the relationship between the "issues of substitutability and underselling." Plaintiff's Brief at 15. Although Plaintiff correctly argues that generally the greater the substitutability between imports and the domestic like products, the greater the volume effects and price effects, *see R–M Industries, Inc. v. United States,* 18 CIT 219, 226–27, 848 F.Supp. 204, 210 (1994), this Court has held that underselling combined with increasing import volumes does not "necessarily indicate[ ] injury due to pricing in cases involving fungible products. . . ." *USX Corp.,* 12 CIT at 849, 698 F.Supp. at 239. In a material injury analysis, substitutability is but one factor in the evaluation of volume and price. *R–M Industries, Inc.,* 18 CIT at 226, 848 F.Supp. at 210.

Moreover, the Commission did not ignore the relationship between substitutability and underselling as claimed by Plaintiff. In her concurrence, Commissioner Crawford specifically analyzed the substitutability between the domestic like product, subject imports and non-subject imports.[14] Commissioner

---

12. Commissioner Crawford states that she "rarely gives much weight to evidence of underselling since it usually reflects some combination of differences in quality, other nonprice factors, or fluctuations in the market during the period in which price comparisons were sought." *Final Determination* at 21, n. 122.

13. Operating income increased from $6.6 million (13.4% margin: ratio to net sales value) in 1994 to $7.8 million (15%). Operating income for interim 1996 amounted to $7.2 million (18.7%) which increased from $5.6 million (11.4%) in interim 1995. *Final Determination* at 15.

14. Commissioner Crawford found that "subject imports of brake drums, the domestic like prod-

Crawford determined that even if the LTFV imports had been priced fairly, the domestic prices would not have increased because the more cheaply priced non-subject imports would have captured the demand from the subject imports.[15] *Final Determination* at 22, n. 124. Thus, despite her construal of imported and domestic brake drums as good substitutes, the Commissioner found that the subject imports were not having significant effects on the domestic price of brake drums.

## 3

### Substantial Evidence Supports The Commission's Determination That LTFV Imports Had No Adverse Impact On Domestic Products

Concerning the impact of LTFV imports on the state of the domestic industry, Congress requires that

the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.[16]

19 U.S.C. § 1677(7)(C)(iii).

Here, Plaintiff contends that, contrary to the ITC determination, the subject imports adversely impacted the domestic industry. Plaintiff pinpoints several economic factors as the underlying thrust to its claim: an increase in inventories and a decrease in demand for U.S. products in conjunction with the economic factors discussed earlier with regard to price effects.[17] Plaintiff's Brief at 17–19. Additionally, Plaintiff disputes the ITC's conclusion that the initial decline in operating income (1993–1994) and any other negative effects on the domestic industry were outweighed at the conclusion of the POI by the positive rebound in the domestic industry in 1996. Instead of signifying the domestic industry's ability to recuperate in the face of Chinese competition, Plaintiff contends the 1996 resurgence resulted from an increase in auto sales and the favorable performance of the U.S. economy in 1996 and therefore serve as an inappropriate basis for denying relief.

Similarly, Plaintiff argues that the ITC's conclusion that "the aftermarket drum indus-

uct, and nonsubject imports of aftermarket brake drums are good substitutes for each other." *Final Determination* at 22, n. 124.

**15.** In its Reply, Plaintiff claims that "imports of LTFV drums from China increased while imports of non-LTFV [drums] decreased. Thus, LTFV imports have greater penetration force than non-LTFV imports." Plaintiff's Reply at 5. While it is true that non-LTFV imports from China declined from 1993–1994, imports of non-LTFV drums rose from 339 to 374 units from 1994–1995 and substantially increased by 77% (from 286 to 507 units) from interim 1995 to interim 1996 (thousands of units). *Final Determination* at IV–8.

**16.** Section 222(b)(1)(B) of the URAA amended section 771(7)(C)(iii) of the Tariff Act to add "the magnitude of the margin of dumping" to the list

of factors the ITC is required to consider. "This amendment does not alter the requirement in the current law that none of the factors which the Commission considers is necessarily dispositive in the Commission's material injury analysis." Statement of Administrative Action accompanying the URAA at 180, H.R. Doc. No. 103–316, Vol. 1, 103d Cong., 2d Sess. (1994) *reprinted in* Uruguay Round Agreements Act, Legislative History, Vol. VI, at 850 ("SAA").

Plaintiff does not challenge and the ITC considered the magnitude of the dumping margin. *See Final Determination* at 23, n. 128.

**17.** Plaintiff also argues that the decrease in domestic price, market share and operating income from 1993–1994 lend support to its claim that subject imports adversely affected the domestic industry. These economic factors were addressed earlier in regard to price effects.

try showed strong financial performance" fails the "[c]ourt's ... healthy industry test." *Id.* at 21. Plaintiff argues that even if the domestic industry were healthy, the domestic industry "would be in a much better situation had Chinese imports not been dumped in the U.S. market." *Id.* at 20–21.

Finally, Plaintiff claims that the ITC failed to fully consider the price depressing effects of the subject drum imports in comparison with the 33 domestic drum models upon which Plaintiff submitted relevant evidence. Hence, Plaintiff asserts that the ITC's finding of no adverse impact on the domestic industry is contrary to the facts in the record and thus unsupported by substantial evidence. The Court will address each of these arguments *seriatim.*

a

The Commission Reasonably Limited The Probative Value of Increasing Inventory Levels

▆▆ The ITC acknowledged that domestic industry inventory levels, with some fluctuation, generally increased during the investigation period.[18] However, "[a]n increase in inventories does not compel an affirmative determination." *Torrington Co. v. United States,* 16 CIT 220, 225, 790 F.Supp. 1161, 1169 (1992) *aff'd,* 991 F.2d 809, 1993 WL 56597 (Fed.Cir.1993); *see Jeannette Sheet Glass Corp. v. United States,* 11 CIT 10, 16, 654 F.Supp. 179, 183 (1987) (affirming preliminary negative injury determination in the face of increasing inventories throughout period of investigation). Plaintiff's argument, in essence, concerns the weight the Commission assigned to the increase in inventories, which is within its discretion. The Court's duty is not to reweigh the evidence. In light of the ITC's findings concerning increases in the domestic industries capacity, capacity utilization, production and operating income, it was reasonable for the Commission to reach a negative determination despite the increase in the domestic industry's inventories.

Moreover, despite the increase in absolute inventory levels, the ITC found that "[t]he ratio of inventories to U.S. shipments declined from 25.4 percent in 1993 to 20.6 percent in 1994, and then rose to 22.3 percent in 1995; this ratio was 21.5 percent in interim 1996, as compared to 21.9 percent in interim 1995." *Final Determination* at 14. The decline in the ratio of inventories to U.S. shipments indicates a lack of inventory buildup adverse to the industry. *See Calabrian Corp. v. United States Int'l Trade Comm.,* 16 CIT 342, 349, 794 F.Supp. 377, 384–385 (1992) (affirming negative preliminary injury determination based on, *inter alia,* shipment to inventory ratio); *see also Nat'l Assoc. of Mirror Manufacturers v. United States,* 12 CIT 771, 776, 696 F.Supp. 642, 646 (1988) (declining ratio of inventories to total shipments).

b

The Court Declines To Take Judicial Notice Of Newspaper
Reports Of The Favorable Performance Of The U.S. Industry

▆▆ Plaintiff contends that the 1996 resurgence in the domestic industry resulted from an increase in auto sales and the favorable performance of the U.S. economy in 1996 and therefore serve as an inappropriate basis for denying relief. Plaintiff failed to raise this issue at the administrative proceeding below, yet requests the Court to take judicial notice of these "facts" as presented in the Wall Street Journal and The Chicago Tribune.[19]

This Court's review of a final determination in an administrative review is restricted to a review of the administrative record. *See* 19 U.S.C. § 1516a(b)(2)(A)(1994). The administrative record "is limited to the information that was presented to or obtained by the agency making the determination during the particular review proceeding for which section 1516 authorizes judicial re-

---

**18.** Inventory levels decreased from 467,000 units in 1993 to 465,000 units in 1994. Inventory levels then jumped to 603,000 units in 1995. Interim 1996 levels of 563,000 units decreased from interim 1995 levels of 600,000 units. *Final Determination* at 14.

**19.** *Economists are Predicting Slower '97 Growth,* Wall Street Journal, A2, Jan.2, 1997; *Walkout in Canada Muddies UAW Talks,* Chicago Tribune, Bus. 1, Oct. 4, 1996.

view." *Koyo Seiko Co., Ltd. v. United States,* 955 F.Supp. 1532, 1544, n. 9 (1997) (quoting *Neuweg Fertigung v. United States,* 16 CIT 724, 726, 797 F.Supp. 1020, 1022 (1992)). "Where the issue has not been raised at the administrative level, ... a litigant must not be allowed to circumvent the requirement of exhausting its administrative remedies by raising the issue in its civil action." *Calabrian Corp.,* 16 CIT at 347, 794 F.Supp. at 383 (quoting *Empire Plow Co., Inc. v. United States,* 11 CIT 847, 854, 675 F.Supp. 1348, 1354 (1987)). However, Fed.R.Evid. 201 provides that "[w]hether the action is before the court for decision on a record made before the agency or on the record made at a trial *de novo,* indisputable facts ... may be judicially noticed by the court when such notice is requested by a party and is otherwise appropriate." *Win–Tex Products, Inc. v. United States,* 17 CIT 786, 789, 829 F.Supp. 1349, 1352 (1993); *see Borlem S.A.Empreedimentos Industriais v. United States,* 8 Fed. Cir. (T) 164, 913 F.2d 933 (1990) (rejecting concept that review on the administrative record precludes any role for judicial notice).

The Court finds that the two newspaper articles are insufficient to satisfy the requirements of Rule 201 which require that judicially noticed facts are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201; *see e.g., British Steel, plc v. United States,* 879 F.Supp. 1254, 1318 (1995) (rejecting request for judicial notice of facts neither generally known or readily verifiable).[20]

■ While it is true that a court may, in certain limited circumstances, take judicial notice of facts reported in newspaper articles, *see Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458–59 (9th Cir.1995); *see also Associated General Contractors of America*

*v. City of Columbus,* 936 F.Supp. 1363, 1425 (S.D.Ohio 1996), judicial notice of newspaper articles is not appropriate when the reported facts are not capable of easy verification. *See Cofield v. Alabama Public Service Comm'n,* 936 F.2d 512, 517 (11th Cir.1991). Here, Plaintiff is not asking the Court to take judicial notice that two newspapers *reported* that the 1996 U.S. economy grew and light auto sales increased, but of the fact that the 1996 economy grew and light auto sales increased. Newspaper stories simply are not, by and large, admissible proof of facts. Plaintiff's assertions require the development of a factual record and the Court declines to take judicial notice of Plaintiff's proffered evidence. *Cf. Ohio Bell Telephone Co. v. Public Utilities Comm'n,* 301 U.S. 292, 301, 57 S.Ct. 724, 81 L.Ed. 1093 (1937)("[h]ow great the decline has been for this industry or that, for one material or another, in this year or in the next, can only be known to the experts, who may even differ among themselves.").

Moreover, even if the Court took judicial notice of the fitness of the U.S. economy in 1996, Plaintiff's rationale provides absolutely no basis for rejecting the Commission's well-reasoned determination.[21]

c

The Commission Considered Whether The Domestic Industry
Would Have Been Better Off Had LTFV Imports Not Been Dumped.

Plaintiff argues that the ITC's reliance on the health or robustness of the domestic industry cannot form the basis for an absence of material injury finding. Plaintiff maintains that even assuming the domestic industry was healthy, it "would be in a much better situation had Chinese imports not been dumped in the U.S. market." Plaintiff's Brief at 20–21. Plaintiff cites to *Republic Steel Corp. v. United States,* 8 CIT 29, 591 F.Supp. 640 (1984) and *Ball Bearings, Mounted or Unmounted, and Parts Thereof,*

---

**20.** At oral argument Plaintiff conceded that it could not offer any additional supporting authority other than *Central Soya Co., Inc. v. United States,* 15 CIT 35 (1991) which concerns judicial notice of legislative facts.

**21.** Defendant–Intervenor California Brake Drum points out that if "the brake drum industry was doing well because of the U.S. economy, why was its companion industry [brake rotors] doing so poorly." California Brake Drum and Rotor's Response to Plaintiff's Motion at 16.

*from Argentina, et al.,* USITC Pub. 2374, Inv. Nos. 701–TA–307 and 731–TA–498–511 (April 1991) where Commissioner Brunsdale states in her dissent,

> [a]n industry can be profitable or "healthy" and still be materially injured by dumped imports. For example, an industry's sales have increased, but they would have increased much more ... had imports not been dumped in the U.S....

*Id.* at 60.

At oral argument, Plaintiff withdrew its argument in light of contrary authority cited by the Government.[22]

d

### The ITC Considered And Reasonably Discounted Plaintiff's Proffered Evidence Of 33 Domestic Drum Models

Plaintiff also claims that the ITC failed to consider the price depressing effects of the drum imports from China in comparison to the 33 domestic drums models which compete directly with the Chinese drums. Plaintiff's Brief at 21. Plaintiff contends that data it submitted indicated that two of Plaintiff's companies demonstrated "weaker financial performance on the 33 drum models...." *Id.* Plaintiff's argument is unpersuasive.

Despite Plaintiff's allegation, the ITC expressly considered and subsequently determined that the material submitted by Plaintiff was of limited probative value. *See Final Determination* at 23, n. 127. The ITC properly found it limited because "petitioner ha[d] not provided information from all domestic drum producers, and provide[d] only interim 1996 data for one producer." *Id.* Indeed, the statutory language "makes manifestly clear that Congress intended the ITC [to] determine whether or not the domestic industry (as a whole) has experienced material injury due to the imports." *Copperweld,* 12 CIT at 165–66, 682 F.Supp. at 569 (rejecting a disaggregated analysis); *see Torrington Co. v. United States,* 16 CIT 220, 223, 790 F.Supp. 1161, 1167 (1992) (Commissioner did not abuse discretion by relying on questionnaire data and rejecting census data which was not available for entire period).[23] Thus, "[i]n requesting the Court to substitute the data contained in its petition for the questionnaire data, plaintiff requests the Court to [impermissibly] substitute its judgment for that of the Commission." *Id.*

The ITC considered all the factors that Plaintiff asserted as indicators of material injury such as price underselling, the decline in domestic market share, the decline in profitability when the subject imports were first introduced and the increase in inventories. Nonetheless, the Commission in the discretion assigned to it by Congress, gave more weight to economic factors it felt more relevant and more probative to the investigation. As the Commission determined, other indicators such as capacity, capacity utilization,

---

**22.** Arguing that the Coalition's brief mischaracterized the pertinent law, the government cited to *American Lamb Co. v. United States,* 785 F.2d 994 (Fed.Cir.1986) (overruling *Republic Steel*) and *American Spring Wire Corp.. v. United States,* 8 CIT 20, 25, 590 F.Supp. 1273, 1277 (1984), *aff'd* 760 F.2d 249 (Fed.Cir.1985) (ITC is obligated to consider pertinent economic data including health).

Commissioner Crawford's analysis of that issue assessed "the state of the industry when the LTFV imports were dumped with what the state of the industry would have been had the LTFV imports been fairly traded." *Final Determination* at 22, n. 125. She found, after an evaluation of all the relevant economic factors, "the domestic industry would not have been able to increase its prices had subject imports been priced fairly." *Id.* Her reasoning was largely based on the role played by non-subject imports which "would have competed [with the domestic

industry] for any shift in demand away from higher priced fairly traded subject imports." *Id.* Indeed, as noted earlier, the importation of non-LTFV imports from China jumped from 286,000 units in interim 1995 to 507,000 units in interim 1996 (by 77%). *Final Determination* at IV–3, Table IV–1. Hence, the Commissioner concluded the domestic industry would have captured only part of any shift in demand away from fairly priced subject imports and any increase in output and sales would not have been material.

**23.** Nevertheless, the Commission found that in spite of its minimal value, the information submitted by Plaintiff only corroborated the Commission's findings. The 33 domestic drum models allegedly facing the most competition from the subject imports contributed substantially to the producers' overall operating income and had positive operating results. *Final Determination* at 23, n. 127; Defendant's Confidential Appendix Doc. 28.

shipments, operating income and productivity rose during the period of investigation, and therefore, it did not abuse its discretion in reaching a negative determination.

B

The ITC'S Determination That The Domestic Brake Drum Industry Is Not Threatened With
Material Injury By The LTFV Imports
Is Supported By Substantial Evidence

 The ITC's determination of threat of injury is governed by 19 U.S.C. § 1677(7)(F), which sets forth the economic factors that the Commission must consider in investigating such a threat. The statute states:

In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant factors—

(I) if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) in any investigation under this subtitle which involves imports of both a raw agricultural product ... and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 1671d(b)(1) or 1673d(b)(1) of this title with respect to either the raw agricultural product or the processed agricultural product (but not both),

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i) (1994).

Of the foregoing factors, numbers I and VII are not applicable here because (I) there is no subsidy at issue, and (VII) no agricultural products, raw or processed, are involved. *Final Determination* at 24, n. 133.

It is also important to note that the list of factors is not exhaustive. The statute calls on the ITC to consider the enunciated criteria "among other relevant economic factors." 19 U.S.C. § 1677(7)(F)(i)(1994). In making its threat determination, the ITC is required to consider the economic factors as a whole to determine whether further dumped imports are imminent and whether material injury would occur unless an order is issued.

19 U.S.C. § 1677(7)(F)(ii) (1994). "The presence or absence of any factor which the Commission is required to consider . . . shall not necessarily give decisive guidance with respect to the determination. Such a determination may not be made on the basis of mere conjecture or supposition." *Id.*[24]

Although the URAA made changes to section 771(7)(F)(ii) of the Tariff Act, "[t]his new language is fully consistent with the Commission's practice in making threat determinations, the existing statutory language which requires that threat determinations be based on 'evidence that the threat of material injury is real and that actual injury is imminent,' and judicial precedent interpreting the statute." SAA at 184, URAA, Legislative History, Vol. VI at 854; *Final Determination* at 24, nn. 131–32.

### 1

### The ITC Found That The Domestic Industry Is Not Threatened With Material Injury

In the *Final Determination* the ITC unanimously concluded that the domestic aftermarket drum industry is not threatened with material injury by reason of LTFV imports from China. In examining each of the relevant statutorily specified factors, the Commission determined that the evidence does not indicate the likelihood of substantially increased volumes of LTFV brake drum imports. *Id.* at 24.

Despite significant increases in the LTFV brake drum capacity during the POI, and the export of an overwhelming majority of LTFV brake drums to the United States, the ITC found there is no likelihood of substantially increased subject imports into the United States. *Final Determination* at 24–25. This conclusion was buttressed by the fact that subject import volume and market penetration were lower in interim 1996 than in interim 1995. In addition, the ITC found dispositive the emphasis the Chinese producers gave to production for other markets, and the capacity increases during the later portion of the POI which did not simultaneously give rise to an increase in exports of

LTFV drums to the United States. *Id.* at 25.

The ITC also found, based on the reasoning in its material injury analysis, that since subject imports had no significant price effects on the domestic product at current import volumes, they were unlikely to have such effects in the imminent future. *Id.*

In addition, the ITC determined that subject brake drum inventories held in China are minimal. Moreover, although inventories of subject brake drums maintained in the United States increased over the POI, the ratios of these inventories to subject imports and to U.S. shipments were lower towards the latter portion of the investigation. *Id.*

Finally, the ITC found no information in the record indicating potential for product shifting or any other demonstrable adverse trends that indicate imminent material injury.

### 2

### Plaintiff Did Not Show That The ITC Failed To Consider Evidence In The Record

■ Plaintiff challenges the ITC's findings, asserting that the

> ITC failed to consider or failed to state its reasons behind its analysis of the increasing capacity of the Chinese producers, the increasing volume of LTFV drums imports, the price depressing effects of the imports on the domestic industry, increasing inventories of imported drums both in the U.S. and in China, the potential for shifting drum production into rotor production . . . and underselling.

Plaintiff's Brief at 5–6.

An examination of the Commission's opinion shows that the ITC considered all the relevant economic factors required by the statute. Once again, Plaintiff is arguing that the ITC should have arrived at a different conclusion based on the factual foundation behind the analysis. Once again, the Court notes that as in a material injury determination, the ITC's threat determination "is af-

---

**24.** The 1994 statutory threat of material injury determination "is subject to the same evidentiary requirements and judicial standard of review as

a *present* material injury determination." SAA at 185, URAA, Legislative History, Vol. VI at 855 (emphasis in original).

forded discretion in interpreting the data, and the court does not weigh the evidence." *U.S. Steel Group,* 18 CIT at 1224, 873 F.Supp. at 703 (citing *Bando Chem. Indus., Ltd. v. United States,* 16 CIT 133, 136, 787 F.Supp. 224, 226 (1992)). "[Court] review does not extend beyond determining whether the Commission has acted within its delegated authority and has correctly interpreted and applied the law." *Bando Chem. Indus., Ltd. v. United States,* 17 CIT 798, 802 (1993), *aff'd,* 26 F.3d 139, 1994 WL 163953 (Fed.Cir. 1994).

Thus, a plaintiff bears the burden of proving that the challenged determination is unsupported by substantial evidence, *see Bando Chemical Industries, Ltd.,* 17 CIT at 802–803, and it is a burden that Plaintiff in this case fails to carry.

First, Plaintiff claims that the ITC failed to properly consider the increase in capacity for LTFV drums.[25] Plaintiff also asserts that the ITC failed to explain its "remote" conclusion that "there is also an increasing emphasis among Chinese producers to increase production for home market consumption and exports to third-country markets." Plaintiff's Brief at 24.

As discussed earlier, the ITC acknowledged the increase in capacity, but determined that in light of the prior history, the increase in capacity would not lead to a likelihood of substantially increased subject imports to the United States. More specifically, the ITC reasoned that significant capacity increases during the latter portion of the POI coincided with a decrease in subject drum volume and market penetration. For example, although capacity [ ] by [ ] units from interim 1995 to interim 1996, subject import volume and market penetration decreased from interim 1995 to interim 1996. Therefore, since little correlation existed between capacity increases in China and changes in subject import volumes during the POI, the ITC could not conclude the existence of additional capacity in China alone indicates a likelihood of substantially increased imports to the United States. *Final Determination*

at 25. *See Calabrian Corp.,* 16 CIT at 354, 794 F.Supp. at 388 (strong indication of likelihood of injury in the near future is industry's present state); *see also* H.R.Rep. No. 1156, 98th Cong., 2d Sess. 174 (1984) *reprinted in* 1984 U.S.C.C.A.N. 5220, 5291 (determination of threat requires careful assessment of identifiable current trends).

Moreover, in contrast to Plaintiff's claim, the ITC did not render its conclusion that Chinese producers are increasing production for other markets without foundation, but based its decision on the evidence presented in the record. *See Final Determination* at 25, n. 140. First, data submitted in response to the ITC questionnaires from the Chinese producers indicate a projected [ ] in exports to other markets from [ ] units in 1996 to [ ] in 1997. Defendant's Confidential Appendix at Doc. No. 33. Second, at the hearing, a witness testified to the significant growth in the automotive industry in China. Commission Hearing Transcript dated February 28, 1997 attached to Defendant's Non-confidential Appendix. Finally, the ITC relied on information submitted by Plaintiff in its prehearing brief which described the Chinese automotive industry's plan to "develop into a pillar industry of the national economy." Exhibit 9 of Plaintiff's Prehearing Brief attached to Defendant's Non-confidential Appendix. Therefore, the Court finds that the ITC reasonably concluded that the increase in capacity would not lead to a likelihood of substantially increased LTFV imports into the United States.

Next, contrary to Plaintiff's assertion that the ITC did not explain its reasoning for discounting the decrease in U.S. price, the effects of underselling, and the substitutability of the products, the ITC considered the evidence but did not find it likely that the subject drum imports will have significant depressing effects on domestic prices. *Final Determination* at 25. The ITC specifically referred to its findings involving underselling and substitutability discussed in its material injury determination. Since the ITC previously found that at current levels, the subject

---

**25.** Capacity increased from [ ] units in 1993 to [ ] units in 1994 then jumped to [ ] units in 1995. Interim 1995 amounted to [ ] units compared to

[ ] units in interim 1996. Defendant's Confidential Appendix at Doc. 33 (thousands of units).

imports did not have adverse effects on domestic prices, the ITC found that there is no basis for concluding that "such price effects are likely to occur in the imminent future." *Final Determination* at 25.[26] *See Committee of Domestic Steel Wire Rope and Specialty Cable Manufacturers v. United States*, 17 CIT 233, 818 F.Supp. 376 (1993) (affirming no threat determination despite evidence of underselling since no indication of suppressing effect on U.S. prices); *Calabrian Corp.*, 16 CIT at 354, 794 F.Supp. at 388 ("A strong indication of the likelihood of material injury to an industry in the near future is its present state.").

Plaintiff protests the ITC's classification of inventories maintained in China as minimal. [However, an examination of inventories over total shipments results in only a negligible ratio.] *See U.S. Steel Group*, 873 F.Supp. at 702 (affirming no threat determination because, *inter alia*, Canadian inventory volumes were small as compared with total Canadian shipments). It was not unreasonable for the ITC to conclude that the level of inventories was minimal and therefore did not pose a threat to the U.S. industry. Moreover, as the ITC explained, although inventories of the subject imports in the United States increased over the POI,[27] the ratios of LTFV imports inventories to subject imports and to U.S. shipments of subject imports decreased from 1993 to 1995. *Final Determination* at 25. This decline in ratios indicated that there was no inventory buildup of subject imports in the United States.[28]

Plaintiff also contends that the ITC failed to substantiate its conclusion that no potential for product shifting existed given the fact that five of the brake drum producers also produce brake rotors.[29] Plaintiff states that "there are five producers who could potentially shift all of their resources from producing drums to producing the rotors...." Plaintiff's Brief at 28. The Court finds Plaintiff's contention lacks merit. Theoretically, if all five producers discontinued the production of brake drums and shifted their resources in order to produce more rotors, any potentially existing threat to the domestic brake drum industry would diminish. Instead, the ITC found no information in the record indicating any potential for product-shifting. *See Stalexport v. United States*, 19 CIT 758, 784, 890 F.Supp. 1053, 1074 (1995) (threat determination may not be based on conjecture or speculation).

Additionally, Plaintiff argues that the ITC failed to properly consider additional relevant adverse factors such as U.S. producers' statement of plans for production, an increase in Chinese drum capacity, underselling, product substitutability, and the financial loss of two U.S. drum producers.

The Court has already addressed the issues of increasing Chinese drum capacity, underselling and product substitutability and its reasoning and conclusions will not be repeated here. As to the U.S. producers' statements concerning future plans for production, Plaintiff claims that [the ITC ignored their statements relating to obstacles for future growth in its threat determination.] Defendant claims that Plaintiff mischaracterizes the producers' statements concerning actual and potential effects concerning plans for product development, capital raising and production efforts. Defendant argues that the producers' statements were [overly general in nature.]

The Court finds that the ITC reasonably limited the probative weight of Plaintiff's evi-

---

**26.** Regarding the issue of substitutability, as discussed above, Commissioner Crawford explained that even if LTFV imports had been priced fairly, the domestic prices would not have increased and therefore the subject imports did not have significant effects on the domestic prices.

**27.** Inventories increased from 134 units in 1993 to 301 units in 1994 and then to 354 units in 1995. Inventories for Interim 1995 amounted to 322 units compared to 404 units for interim 1996. *Final Determination* at VII–3 (thousands of units).

**28.** The 1988 statute requires consideration of "any substantial increase in inventories of the merchandise in the United States." The Amended section now tracks more general references to inventories allowing the Commission to consider inventories of subject merchandise wherever they are located. SAA at 184, URAA, Legislative History, Vol. VI at 854.

**29.** The ITC had previously made a material injury finding as to brake rotors.

**934**

dence here since [the statements did not rise to the level of specificity required.] *Cf. Alberta Pork Producers' Marketing Board v. United States*, 11 CIT 563, 669 F.Supp. 445 (1987) (rejecting use of estimates that did not describe the specific product under consideration).

Finally, regarding the financial loss of the two U.S. drum producers, as discussed earlier, the ITC decided to limit the probative value of this evidence submitted by Plaintiff, and, in any event, the evidence actually supported the ITC's conclusion.

## C

### The Court Denied Plaintiff's Critical Circumstances Request As Moot.

Since the *Final Determination* of the Commission is affirmed and no material injury or threat of material injury is found as to brake drums from China, Plaintiff's request that the Court stay its determination as to critical circumstances is denied as moot.

## V

### CONCLUSION

For the foregoing reasons, the court finds that the ITC's determination of no material injury and no threat of material injury is supported by substantial evidence and in accordance with law. Plaintiff's motion for judgment on the agency record is denied.

### JUDGMENT

This case having come before the Court for decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED ADJUDGED and DECREED that Plaintiff's Motion for Judgment on Agency Record is denied; and it is further

ORDERED ADJUDGED and DECREED that the action of the International Trade Commission is sustained.

ORDERED ADJUDGED and DECREED that all parties shall review the Opinion and notify the Court on or before July 8, 1998 whether any information contained in the Opinion is confidential, identify any such in-

formation, and request its deletion from the public version of the Opinion to be issued thereafter. If a party determines that no information needs to be deleted, that party shall so notify the court on or before July 8, 1998.