**Slip Op. 02-65**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                              :

|  |  |
|---|---|
| ALTX, INC., AMERICAN EXTRUDED PRODUCTS, CORP., DMV STAINLESS USA, INC., SALEM TUBE, INC., SANDVIK STEEL CO., PENNSYLVANIA EXTRUDED TUBE COMPANY, and UNITED STEEL WORKERS OF AMERICA, AFL-CIO/CLC, | : |
| Plaintiffs, | : |
| v. | : |
| THE UNITED STATES, and THE UNITED STATES INTERNATIONAL TRADE COMMISSION, | : |
| Defendants, | : Court No. 00-09-00477 |
| and | : **Public Version** |
| SUMITOMO METAL INDUSTRIES, NIPPON STEEL CORPORATION, KAWASAKI STEEL CORPORATION, NKK CORPORATION, KOBE STEEL LTD., and SANYO SPECIAL STEEL COMPANY, | : |
| Defendant-Intervenors. | : |

[ITC material injury remand determination remanded.]

Dated:  July 12, 2002

Collier Shannon Scott, PLLC (David A. Hartquist, Jeffrey S. Beckington, and R. Alan Luberda) for plaintiffs.

Lyn M. Schlitt, General Counsel, Marc A. Bernstein, Assistant General Counsel, United States International Trade Commission (Rhonda M. Hughes), for defendants.

Wilmer, Cutler & Pickering (John D. Greenwald, Leonard Shambon, and Lynn M. Fischer) for defendant-intervenors.

**OPINION**

**RESTANI, Judge:**

This matter comes before the court as a result of the court's decision in Altx, Inc. v. United States, 167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) [hereinafter, "Altx I"]. There, the court remanded Circular Seamless Stainless Steel Hollow Products ["CSSSHP"] from Japan, Inv. No. 731-TA-859 (Final), USITC Pub. 3344 (Aug. 2000) [hereinafter, "Final Determination"], for the International Trade Commission (the "ITC" or the "Commission") to reconsider and to explain more fully its negative injury determination in light of certain arguments raised by plaintiffs Altx, Inc., American Extruded Products Corp., DMV Stainless USA, Inc., Salem Tube, Inc., Sandvik Steel Co., Pennsylvania Extruded Tube Company, and United Steelworkers of America, AFL-CIO/CLC (collectively, the "Domestic Producers"). In the Final Results of Redetermination Pursuant to Court Remand (Int'l Trade Comm'n Dec. 3, 2001) [hereinafter, "Remand Determination"], the Commission, in a 3-3 vote, rendered an affirmative injury determination. The Remand Determination adopts in full and without change the Additional and Dissenting Views of Chairman Stephen Koplan and Vice Chairman Deanna Tanner Okun that had been issued pursuant to the original determination, joined by Chairman Dennis M. Devaney, who was appointed after the issuance of Altx I. See Final Determination at 1 n.2, and Remand Determination at 2. Defendant-Intervenors in Altx I and respondents in the underlying investigation, Sumitomo Metal Industries, Inc., Nippon Steel Corporation, Kawasaki Steel Corporation, NKK Corporation, Kobe Steel, Ltd., and Sanyo Special Steel Company, Ltd.

(collectively, the "Japanese Producers"), appeal the Remand Determination on two grounds.

First, the Japanese Producers assert that the Commission majority did not adequately address

material arguments raised in their post-hearing briefs, and drew conclusions of fact that do not

fairly reflect the evidence on the record. Second, the Japanese Producers contest the legitimacy

of the appointment of Commissioner Devaney and seek invalidation of his affirmative remand

vote. Because of various inadequacies in the Remand Determination, the court remands it on

substantive grounds and does not reach the second issue.[1]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). In reviewing final

determinations in antidumping duty investigations, the court will hold unlawful those agency

determinations which are "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Volume

Under 19 U.S.C. § 1677(7)(C)(i), the Commission shall consider "whether the volume of

imports of the merchandise, or any increase in that volume, either in absolute terms or relative to

production or consumption in the United States, is significant." First, Japanese Producers claim

that the Commission's volume calculations are inaccurate. Second, Japanese Producers claim

that even if the Commission's calculations were proper, the Commission ignored various

---

[1] The court notes that the appointment of Chairman Devaney is at issue in other cases before the court, including Nippon Steel Corp. v. United States, Consol. Court No. 01-00103, Slip Op. 01-153 (Ct. Int'l Trade Dec. 28, 2001), in which discovery has been granted as to the timing of the President Clinton's actions with respect to Mr. Devaney's appointment.

conditions of competition that undermine its conclusions as to the significance of subject import volume.

## A.  Purchases of Subject Merchandise by Domestic Producers

The scope of the subject merchandise includes certain grades of "redraw hollows" that are also used as a material to produce cold-finished CSSSHP.  As a result, some U.S. cold-finished CSSSHP producers purchase redraw hollows from Japanese producers and/or other U.S. producers.  See Staff Report at V-7 (Products 8 and 9), and III-6.[2]  The Staff Report explains that U.S. producers purchase CSSSHP raw materials, including "billets, bars, and/or redraw hollows, in order to supplement product lines, or because product types were not domestically available." Staff Report at III-6.[3]

The Japanese Producers claim that the Commission understated domestic production by excluding domestic shipments of redraw hollows from its calculation of domestic consumption, without making a similar adjustment for imported redraw hollows.  The Japanese Producers

_____

[2] The Staff Report at I-15 explains how product specifications dictate whether redraw hollows are considered upstream articles or end-products as follows:

> [C]old-finished CSSSHP are downstream products, and redraw hollows, which are particular hot-finished and cold-finished CSSSHP, are the upstream or intermediate product.  Hot-finished CSSSHP have many uses independent from the production of cold-finished CSSSHP.  Such uses include pipe, tubing, and hollow bar.  Many specifications, particularly those for pipe, allow the use of either hot-finished or cold-finished product at the option of the manufacturer, thereby making the choice dependent upon the specific manufacturing capabilities of the manufacturer.

[3] The Staff Report indicates that [                                             ].

Staff Report at V-23 to 24 (footnote omitted).

emphasize that purchases of subject imports by U.S. producers, which constitute the bulk of the increase in volume, actually benefitted the U.S. industry. The Commission responds that "when the ITC presents U.S. data for a single domestic like product that includes two articles at different levels of production, it excludes sales/purchases of the upstream article (here, redraw hollows) destined for use in the downstream article (here, CSSSHP), to avoid double counting." ITC Br. at 19. The Commission further explains that it does not exclude upstream imports that are subject products from the import side, because they are within the scope of the product subject to investigation, and the Commission tries to "capture" all subject merchandise.

The Commission's methodology of excluding only domestic shipments of redraw hollow is reasonable. Exclusion of sales by domestic producers to other domestic producers is warranted in calculating apparent domestic consumption because the volume corresponding to those particular sales ultimately will be accounted for when the purchasing U.S. producers report their sales of the further finished products to end-users. Such exclusion does not, as the Japanese Producers contend, "understate" U.S. production, as an upstream good is not "produced" a second time when it is finished for resale. In contrast, inclusion of purchases of Japanese imports by U.S. producers bears no such risk of double counting, as there is no initial domestic sale of a good that will be resold in the U.S. Excluding purchases of Japanese redraw hollows by U.S. producers simply because such purchases "benefit" the U.S. producers in some way would distort the amount that U.S. purchasers of CSSSHP actually consume. Similarly, a more accurate calculation would not result from counting initial purchases of U.S.-manufactured redraw hollows and counting them once again when such products are refinished and resold. Accordingly, there is no basis for requiring the Commission to exclude from apparent domestic

consumption the volume of subject merchandise purchased by U.S. producers from Japanese

producers.[4]

**B. Conditions of Competition**

In Altx I, the court reviewed the original Commission majority's determination that

subject import volume was not significant, which had been based in part on a finding of

attenuated competition between the subject imports and the domestic like product. The court

held that the Commission's finding of attenuated competition was supported by substantial

evidence, namely, the "inability of the domestic industry to satisfy an increasing range of

categories of subject merchandise," which according to the Commission may have been

exacerbated by the bankruptcy of a significant domestic manufacturer, ALTech.[5]

_____

[4] The court in Altx I had rejected the Domestic Producers' argument that the Commission was required to consider only the condition of those domestic producers that do not import subject merchandise. See Altx I at 1370. The court reasoned that "[a]lthough one segment of the industry may benefit from dumping while another segment is harmed, the statute does not permit the ITC to manipulate its material injury analysis in favor of petitioners by focusing exclusively on the segment of the defined industry that is harmed." Id. The court emphasized that although the Commission is permitted to exclude from the domestic industry "a producer of the domestic like product [that] is also an importer of the subject merchandise," see 19 U.S.C. § 1677(4)(B), this exclusion occurs at the earlier stage of the Commission's analysis in which the Commission defines the domestic industry. The reasoning in Altx I applies here as well, as the Commission is similarly barred from manipulating its material injury analysis in favor of respondents by artificially reducing the volume of subject imports consumed according to a perceived "benefit" accruing to certain purchasing producers. That the Commission has chosen to include within the scope of the domestic industry the U.S. producers that purchase subject merchandise does not preclude it from making an adjustment for double-counting. To the extent that the purchase of subject imports by U.S. producers constituted a "benefit," such benefit necessarily would be reflected in the domestic industry's overall performance. The Commission also may examine these matters in the context of conditions of competition in order to assess causation.

[5] The court's reasoning in Altx I was as follows:

(continued...)

The Japanese Producers assert that the Commission lacks substantial support for its conclusions regarding: (1) the degree of substitutability between subject imports and domestic production, and (2) the ability of the domestic industry to respond to changes in demand. According to the Japanese Producers, a proper assessment of the nature and extent of competition would preclude a determination that subject import volume is significant. The court finds that although the Commission's subsidiary findings with respect to conditions of competition are supported by substantial evidence, the Commission has not complied with its statutory obligation to determine the significance of subject import volume in terms of those findings.

1. Substitutability

The Japanese Producers argue that the new Commission majority "misstated" the competitive overlap between subject imports and domestic production as having "high substitutability" because it failed to consider certain limitations on competition in certain product

---

[5](...continued)
First, between 1997 and 1999, the percentage range of subject imports for which there was no competition from the domestic industry increased over 50%, showing the domestic industry becoming significantly less competitive with subject imports over the [period of investigation]. Questionnaire responses indicating that domestic sources were unable to satisfy purchasers' requirements further corroborate this trend. Second, the bankruptcy of a significant domestic manufacturer may have amplified this trend. In 1997, ALTech Specialty Steel Corp. ("ALTech"), a domestic producer, went bankrupt and then ceased production of hollow products. To compensate, purchasers, including one that had relied on ALTech for 75 percent of its annual requirement of a certain product, were forced to seek alternative suppliers, including Japanese producers. Thus, between 1997 and 1998, this singular event further reduced the domestic industry's competitiveness with subject imports.

Altx I, at 1363-64 (citations omitted).

sizes and types.   Specifically, the Japanese Producers maintain that the Commission's assessment of competitive overlap did not adequately address its contentions regarding the limitations on domestic sources of supply, namely:  (1) after the bankruptcy of ALTech, there were no viable domestic sources of hot-finished CSSSHP in the 3"-6" outside diameter ("O.D.") range;  (2) independent cold-finishers do not purchase from PEXCO, the only remaining U.S. producer of redraw hollows, on account of its affiliation with their main competitor, Sandvik; (3) major boiler manufacturers had no "qualified" domestic source of supply for hot-finished boiler tubes; (4) cold-finished subject imports are "annealed and pickled" while U.S. product is largely "bright annealed," for which purchasers pay a premium; and (5) International Extruded (or "IXP"), the only U.S. mill able to produce large diameter CSSSHP (i.e., 8" O.D. and up), was not active in the market below 10" O.D.[6] Japanese Producers conclude that the limitations on the overlap in competition, combined with the acknowledged portion of the subject merchandise not produced by the domestic industry, substantially undermine the Commission's determinations that subject import volume during the period of investigation ("POI") was significant.

The Japanese Producers omit that the new Commission majority affirmed its previous overall determination that there is "at least a moderate level of substitutability" between subject imports and the domestic like product with respect to CSSSHP overall.   Remand Determination at 29.  The Commission first found that although subject imports and the domestic like product are generally considered interchangeable by "market participants," purchasers did identify several relative strengths and weaknesses in their sourcing decisions.   Id.  The Commission noted that Japanese hollow products were dominant in the categories of "lowest price" and "broadest

---

[6] The Japanese Producers emphasize that [            ].

product range" while U.S. hollow products were considered superior in delivery time. Id. (comparing Table II-1 to Tables II- 2 and II- 3).

The Commission then specified that "[o]verall, for a range of subject imports – approximately 80 percent [of total subject imports] in 1999 – there is a high degree of substitutability with the domestic like product." Remand Determination at 29-30 (citing Staff Report at II-23 and Table I-2).[7] The Commission recognized, however, that "there is a portion of the market in certain sizes and pursuant to chemistry requirements that the domestic producers are unable to supply." Remand Determination at 30 (citing Staff Report at II-26). The Commission majority described certain industry characteristics that account for this domestic coverage shortfall. Id. at 30 n.13 (citing Staff Report at II-26 to 27).

Thus, it is clear that the Commission's overall determination that there is "at least a moderate level of substitutability" between the subject imports and the domestic like product strikes a balance between: (1) the finding that there was a lack of viable sources for a significant portion of the market, and (2) the finding that for the rest of the market, purchasers generally consider U.S. and Japanese sources interchangeable, i.e., substitutable. The word "moderate"

---

[7] The Staff Report indicates that:

Based on available data, staff believes that there is a high degree of substitution between domestic and imported CSSSHP from Japan for a range of hot-finished and cold-finished products. For a second range of products, however (smaller than the first overall -- how much smaller is a matter of dispute), domestic suppliers do not provide strong alternatives to Japanese imports, if they are produced at all in the United States. This range appears to have more market significance for hot-finished products than for cold.

Staff Report at II-23.

includes the concept of "attenuated," and thus the Commission likely is recognizing that

competition overall is attenuated to a certain extent. The inclusion of "at least" likely indicates

that the Commission believes that competition is only slightly attenuated, rather than so

attenuated as to preclude an affirmative injury determination.

With respect to the former finding regarding viability of domestic supply, there is no

indication that the Commission limited its estimation of the percent of the market not produced

by the domestic industry to only those product types the domestic producers cannot produce.

Rather, it is clear that the Commission considered what the domestic producers actually do or do

not produce. The Commission's description of a domestic coverage shortfall is based on the

evidence detailed in the Staff Report which parallels the practical limitations cited by the

Japanese Producers. The Commission stated:

> Domestic Producers are unable to produce hollow products in certain size
> categories, although the exact size range is in dispute. It appears, however, that
> U.S. capability is lacking in the range from 3 inches to 8 or 10 inches in outside
> diameter. Staff Report at II-26. PEXCO [
>                              ]. PEXCO's Producer Questionnaire Response, Section II-
> 15. International Extruded can produce down to 6 or 8 inch outside diameters, but
> apparently does not actively seek general business below 10 inches because of the
> inefficiency of its press in such sizes. Staff Report at II-16 n.50. In addition,
> American Extruded and ALTech have not always been viewed as viable suppliers.
> Staff Report at II-27.

Remand Determination at 30 n.13.[8] Thus, the Commission considered and relied on evidence

_____

[8] The Staff Report first noted evidence that supported a finding of viability – i.e., that
there are domestic hot-finishers "actively seeking business in sizes up to 6 inches and above 10
inches" – but apparently called into question the practical limitations on this effort. Staff Report
at II-27 n.50. After acknowledging that "International Extruded, an extruder specializing in the
largest sizes (and temporarily out of the market at present) can apparently produce down to 6 or 8
inch outside diameters," the Staff Report indicated that "a number of firms have stated that [
        ] does not actively seek general business below 10 inches because of the inefficiency of its
                                                                              (continued...)

detailed in the Staff Report that generally accepts the Japanese Producer's view of the practical limitations on domestic sources of supply, and made its viability determination accordingly, but ultimately determined that the limitations were not so extensive as to undermine a finding of significant subject import volume.

Staff Report Table I-2, also relied upon by the Commission, indicates that, expressed as a ratio of total imports, the percentage of the CSSSHP market not available from domestic sources ranged from 11.0% in 1997, 19.7% in 1998, and 18.7% in 1999.  Staff Report at I-12. This data was based on purchaser questionnaire responses, which undoubtedly took into consideration the practical limitations on what the U.S. producers actually do supply.  See Staff Report at II-26 n.45 (indicating that several of the purchaser questionnaire responses emphasized domestic deficiencies).  There is no evidence that the purchasers limited their responses to their perceptions of what the domestic industry was capable of producing.  In any event, the court finds the exact percentage is immaterial, as the Japanese Producers do not dispute that, as the Staff Report found, the range of products for which there is no viable U.S. source is smaller than

---

[8](...continued)
press in such sizes."
The Staff Report then discussed other evidence supporting claims of coverage shortfall, noting that it is "well documented domestic capability in the 3 inch to 6 inch range is suspect in the eyes of many purchasers and others in the industry." Id.  As support for this statement, the Staff Report specified that:  (1) American Extruded is not always viewed as a viable supplier; and (2) "[q]uestions still linger . . . about the effects of the ALTech bankruptcy and the extent to which ALTX will be able to improve the competitive position at those facilities." Staff Report at II-27.  The Staff Report also recognized that on balance purchasers are willing to pay a premium for "bright annealing." Id.  Lastly, the Staff Report specifically indicates that its conclusions regarding substitutability took into consideration that domestic redraw hollow purchasers "[

]" Staff Report at II-28.

the remaining segment of the market.[9]

With respect to the latter finding of substitutability for the remaining segment of the

market (i.e., the segment of the market the domestic industry is practically able to supply), the

Commission based its determination of "high degree of substitutability" on the recognized

interchangeability of hollow products from the U.S. and Japan in terms of product characteristics.

See Staff Report at I-10 ("Petitioners and respondents agree that Japanese product is

interchangeable with U.S.-produced product."). The Staff Report explained the

interchangeability in terms of product specifications as follows:

> A significant number of CSSSHP are produced to well-known specifications. For
> firms purchasing these products, there may be little or no physical difference
> whether the product originates in the United States or Japan. Other purchasers
> demand products produced to stricter specifications, ones which some producers
> may have difficulty meeting (as was testified to be the case for super-hot-finished
> boiler tubing, which was reported to be available from Japan but not the United
> States).

Staff Report at II-25.

The Commission also based its assessment of substitutability on purchaser comparisons

of product features. Remand Determination at 29 n.11 (comparing Tables II-1 with Tables II-2

and II-3). Table II-1 indicates that 58 percent of responding purchasers deemed "product range"

a "very important" product feature in decision-making. Table II-2 shows that purchasers deemed

U.S. and Japanese sources of hot-finished "comparable" for 11 out of 14 categories. The only

product features the purchasers deemed one country or the other superior were: "delivery time"

---

[9] Indeed, the Staff Report acknowledged deficiencies in the data in Table I-2 reflecting purchaser questionnaire responses regarding the percentage of purchases unavailable domestically. See Staff Report at II-26 n.45 (noting that "responses . . . were too sparse to enable an overall percentage to be calculated.").

(U.S. superior); "lowest price" (Japan superior); and "product range" (Japan superior). Table II-3 shows a similar breakdown of purchaser comparisons for cold-finished CSSSHP. The Japanese Producers do not dispute the accuracy of purchaser assessments. Indeed, the purchasers' assessment that Japan is superior in product range comports with the Japanese Producers' characterization of the domestic coverage shortfall. Therefore, the Commission's subsidiary finding that there is a high degree of substitutability is supported by substantial evidence. The Commission's ultimate conclusion that there is "at least a moderate level of substitutability" reflects the diminished overlap in competition resulting from the practical limitations described above in light of the recognized interchangeability for the rest of the market.

 2. Responsiveness of the Domestic Industry

The Japanese Producers contend that the new Commission majority overstated the ability of U.S. producers to shift supply in response to changes in the U.S. market. The Japanese Producers maintain that the Commission's analysis took no account of practical limitations on the ability of domestic producers to meet an increase in demand. These limitations involve the domestic coverage shortfall and the effect of foreign affiliates described above. The Japanese Producers concede that the Commission recognized these limitations, but maintains that it "ignores their implications." The Japanese Producers' argument lacks merit.

On remand, the Commission found that U.S. producers had "considerable ability to shift supply" to react to changes in market conditions based on the following findings: (1) there was a

high level of industry exports;[10] (2) domestic producers maintained high levels of inventory;[11] (3)

other products are produced on the same equipment used to produce CSSSHP; (4) there is

"substantial excess capacity" among domestic producers.  In finding that "the domestic industry

has substantial available capacity to produce CSSSHP," however, the Commission noted that:

> at no time during the period examined . . . did [the domestic industry] have
> sufficient hot-finishing or cold-finishing capacity to supply the <u>entire</u> domestic
> demand in either market segment.  These overall capacity limitations, as well as
> product-specific constraints discussed [in its analysis of substitutability], <u>moderate</u>
> the domestic industry's ability to respond to changes in U.S. market conditions.

Remand Determination at 29 (emphasis added).  Although the Commission failed to indicate the

sources for its findings, the Commission's analysis of these various factors parallels various

factors identified in the Staff Report as affecting the responsiveness of the domestic industry to

changes in demand.  The Staff Report described these factors are as follows:

> Factors that tend to raise the degree of responsiveness of supply are the
> availability of unused capacity (especially for the production of cold-finished
> CSSSHP) and a (much more limited) ability to transfer resources from the
> production of alternative products to the production of CSSSHP.  Factors that
> would reduce the supply responsiveness are production rationalization on the part
> of multinational groups with which some suppliers are affiliated and, to some
> degree, the size range limitations of domestic producers.

Staff Report at II-11.  Thus, the Commission recognized that the domestic industry was incapable

---

[10] The Commission stated that:  "Fully one-quarter of the domestic industry's total shipments in 1999 were exports (one-third with respect to hot-finished hollow products only)." Remand Determination at 28-29. The Japanese Producers contend that international affiliation explains the high level of exports among domestic producers, but does not address why, notwithstanding these affiliations, these exports could not be redirected to meet increases in domestic demand.

[11] The Commission stated that:  "U.S. producers maintained inventories (primarily of cold-finished hollow products) equivalent to nearly one-fifth of their total shipments in 1999." Remand Determination at 29.

of supplying every product size and type imported by U.S. purchasers, referencing the reasons

detailed in its substitutability analysis, but ultimately concluded that the other factors listed above

outweighed this fact. That the Commission characterized the degree of responsiveness of the

domestic industry as "considerable" ("rather large in extent or degree") reflects this weighing of

factors. The court declines the Japanese Producers' invitation to second-guess the weight the

Commission chose to assign various criteria in analyzing the responsiveness of the domestic

industry.

**C. Significance of Subject Import Volume**

That the Commission's findings with respect to certain conditions of competition are

supported by substantial evidence, however, does not necessarily mean that its conclusion that

subject import volume is significant is likewise supported.

On remand, the new Commission majority determined that the volume of subject imports

was significant both in absolute terms and relative to production or consumption in the United

States.[12] The Commission further found that while U.S. consumption increased by 10.9 percent

over the POI, the quantity of subject imports increased over this period by 26.8 percent, while

the domestic industry's U.S. shipments decreased by 16.8 percent and imports from all other

countries combined increased by 23.8 percent. Lastly, the Commission noted that "the market

share of imports of the subject merchandise from Japan increased by 3.4 percentage points, the

---

[12] In absolute terms, the Commission found that the quantity of subject imports increased by 95.6 percent from 1997 to 1998, and that "[b]y 1998, the volume of imports of the subject merchandise from Japan surpassed the total shipment volume of the domestic industry and rivaled the volume of imports from all other sources *combined*." Remand Determination at 31. The Commission acknowledged that the quantity of subject imports decreased from 1998 to 1999, but noted that "the quantity of subject imports remained greater than the U.S. shipments of the domestic industry in 1999." Id.

domestic industry's market share decreased by 8.4 percentage points, and nonsubject imports' market shares increased by 4.9 percentage points." Id. at 32.

The Commission concluded that the volume of subject imports was significant without discussing subject import volume in relation to its findings with respect to the conditions of competition. The Commission failed to analyze whether the increase in volume and market share of subject imports corresponds, in whole or in part, to that portion of the market recognized by the Commission as not supplied by the domestic industry (either because of incapability or lack of viability). Specifically, the Commission did not indicate any evidence from which the court may discern whether the increases in volume of subject imports it deemed significant (in particular, the spike in imports from 1997 to 1998) can be attributed to product types or size ranges not produced by the domestic industry. If, as the Commission seems to have conceded, there is a sizeable portion of the market for which the domestic industry does not compete, naturally, the Commission must determine if subject imports are concentrated there. Similarly, the significance of subject import volume would be substantially diminished if the increase in subject imports is primarily or entirely in the range of product types not produced by the domestic industry.[13]

On the other hand, subject import volume might still be significant if, for example, the product range unavailable from domestic sources corresponds to only a small percentage of the

---

[13] For example, the domestic industry experienced a decrease in production from 13,177 short tons in 1997 to 11,827 in 1998, a difference of 1,350 short tons. This decrease was outstripped by an increase in subject imports of Pipe 312/304 >3" from 565 short tons in 1997 to 2160 short tons in 1998. Domestic production of this product, however, was 9 short tons in 1997 and 1 short ton in 1998. It appears, however, that the Commission determined that the domestic sources for this product were not viable, thereby diminishing the significance of the increase in subject import volume of this product.

total increase in subject import volume, or if the bulk of the increase in subject imports can be attributed to product types in which there is intense competition. Similarly, an affirmative significance determination would be supported by a finding that the volume of Japanese imports of products competing directly with the domestic like product increased, while products not produced by U.S. producers declined or remained constant. Japanese production of hot-finished CSSSHP appears to be concentrated in A-312 pipe, while U.S. production is concentrated in redraw hollows. See Staff Report at I-11. The Japanese industry acknowledges, however, that redraw hollows accounted for the bulk of the increase in subject imports over the POI.[14] Nevertheless, it is for the Commission, not the court, to track subject import volume levels over the POI in relation to domestic production, with particular attention to the products accounting for substantial fluctuations thereof.

The Commission argues that it is sufficient that the domestic industry is capable of producing a particular product type, even if for practical considerations it does not produce it in any significant quantity. The Commission states that (1) Altx was "reasonably expected to become as important a supplier as ALTech had been," and (2) that "[w]hile AEP [i.e., American Extruded] may not always be viewed as a viable supplier, Altx supplies CSSSHP in the same size range as AEP, and IXP is also capable of manufacturing products in that range." First, a

---

[14] The Commission could determine that the domestic sources for a particular product were viable, as is apparently the case for Hollows: OD<3". Domestic production of this product went from 4,006 short tons in 1997 to 4,477 short tons in 1998. Subject imports of this product increased from 596 short tons in 1997 to 2,288 short tons in 1998. Thus, the significance of this increase in volume is more significant than if domestic production of this product were not viable. The Japanese Producers themselves indicate that imports of redraw hollow from Japan accounted for [    ] of the total increase in subject import volume over the POI. Def.-Int. Br. at 18.

theoretical possibility of future production says nothing about the extent to which U.S. and Japanese producers actually compete in specific product types or size ranges. Nor does the potential for future viability have any meaning that would bear on the significance of actual subject import volume, or increases thereof, for the purpose of determining present material injury, as opposed to threat of material injury. Second, the Commission majority did not base its characterization of the competitive overlap on the potential to produce certain product sizes in the future, but on purchaser perceptions of the comparability of U.S. and Japanese sources for most product features. The court therefore rejects these post hoc rationalizations of the agency's determination. See Ta Chen Stainless Steel Pipe, Ltd. v. United States, No. 99-07-00446, Slip Op. 01-101, at 9-10 (Ct. Int'l Trade Aug. 14, 2001).

The Commission has made no findings that would enable the court to discern its reasoning in concluding that volume of subject imports are significant notwithstanding the substantial and increasing portion of the market for which there is no viable domestic source of supply. The statute indicates that "[t]he Commission shall evaluate all relevant economic factors [i.e., subject import volume, price effects, and the impact on the domestic industry] within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C). The Commission does not comply with its statutory mandate by simply describing various conditions of competition in isolation. "Congress, this court, and ITC itself have repeatedly recognized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." USX Corp. v. United States, 11 CIT 82, 85, 655 F. Supp. 487, 490 (1987) (citing Atlantic Sugar, Ltd. v. United States, 2 CIT 18, 23, 519 F. Supp. 916, 921-22 (1981)). "[F]or the Commission's

findings under 1677(7)(C)(i) to be supported by substantial evidence, the Commission must

analyze the volume and market share data in the context of the conditions of competition" to

determine if subject import volume is significant. Nippon Steel Corp. v. United States, 2001 CIT

154, 159, 182 F. Supp. 2d 1330, 1335 (2001). Therefore, on remand, the Commission shall

analyze the significance of subject import volume in terms of product types available and

practically unavailable from U.S. sources during the POI, and, to the extent possible, group the

data on viability of domestic sources in a manner that reflects the actual limitations.

In addition, the Commission has not met its burden of explaining displacement by subject

import volume in terms of increasing domestic consumption. Total U.S. consumption need not

in all cases be in decline for an increase in the volume of subject imports to be significant.

Nippon, 182 F. Supp. 2d at 1335. This is not to say, however, that the Commission is absolved

of explaining why subject import volume, or increases thereof, are significant notwithstanding an

increase in total consumption. As the court noted in Nippon, subject import volume may be

considered significant "where U.S. consumption is stable or even increasing, depending on other

market indicators that speak to such displacement." Id. at 1337 (emphasis added). Naturally, if

the increase in domestic consumption outstrips the increase in subject import volume, the

decrease in domestic market share would be less indicative of injury. In this case, the

Commission does not explain, as it must on remand, whether the increase in domestic

consumption corresponds, in whole or in part, to the product range not produced by the domestic

industry.


## II. Price Effects

Under 19 U.S.C. § 1677(7)(C)(ii), "[i]n evaluating the effect of imports of subject merchandise on prices, the Commission shall consider whether (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree."

On remand, the new Commission majority determined that prices for the domestic like product and the subject imports "generally fell" over the POI.   Remand Determination at 32. The Commission also found, and the Japanese Producers do not dispute, that the data showed that Japanese producers of both hot-finished and cold-finished CSSSHP undersold the domestic industry in a majority of instances over the POI. Id. at 32-33.[15]

The Japanese Producers claim that:  (A) the pricing data on which the Remand Determination relies is "sparse" and not representative of the industry as a whole; (B) there is no

_____

[15]  The Commission's findings are as follows:

In the majority of instances in which the domestic and Japanese prices could be compared, the Japanese product was sold in the U.S. market for a price lower than the domestic price.  Notably, underselling occurred most frequently in 1998 and 1999.  In 1997, the Japanese hot-finished stainless hollow products undersold the domestic like product in 7 of 13 instances.  However, in 1998 (when the increase in the volume of subject imports was the greatest) and in 1999, the Japanese product undersold the domestic product in 25 of 31 instances.  In the first quarter of 2000, after the petition was filed and prices for the Japanese product increased, the degree of underselling decreased.  With respect to cold-finished CSSSHP, prices for both U.S-produced and Japanese CSSSHP declined over the period, and reached low points in 1999.  In 31 of 39 instances in which the prices of cold-finished CSSSHP produced in the United States and in Japan could be compared, the Japanese product undersold the domestic like product.

Remand Determination at 33.  See also Staff Report at V-24 ("There is broad (but not universal) price underselling on the part of Japanese products, at margins of up to about [          ] in some cases.")

correlation between underselling and the condition of the domestic industry; (C) record data do

not show price suppression or depression; and (D) other factors explain the drop in domestic

CSSSHP prices.

## A.  Data Sample

In the Remand Determination, the Commission admitted the limited nature of the data,[16]

indicating that the pricing information it relied upon accounted for 1% to 4%[17] of sales of cold-

finished CSSSHP, and 7% of hot-finished.  Id. at 34.  The Commission noted, however, that the

data were "broadly representative of the overall market environment."  The Japanese Producers

argue that the pricing data obtained by the Commission covers only a "mere fraction" of the

CSSSHP market and therefore cannot serve as a basis for an analysis of general trends.

The Commission is not precluded from relying on available pricing data simply because

the pricing data does not encompass the entire or even a majority portion of the market.

Nevertheless, if the data sample is admittedly small, as here, the court must examine the

Commission's reasons for finding the data representative of the entire market.  In this case, the

court finds that Commission's use of the data is reasonable and its assessment that the data were

"broadly representative" is supported by substantial evidence.

The Staff Report explains that the Commission originally had solicited price information

---

[16] In its Brief, the Commission explains that "pricing data were limited for most of the products, in part because of the wide range of specification possibilities for CSSSHP.  In addition, some domestic producers specialize in less common CSSSHP specifications, so there was little or no production of the relatively generic products for which pricing data were sought." ITC Br. at 23.

[17]  The Staff Report indicates that the data sample represents 0.3 to 3.9% of cold-finished hollow products sales in the United States and imported from Japan.  See Staff Report at V-8.

with respect to nine products of specific average wall thickness and outside diameter. Staff

Report at V-6. These products included two types of hot-finished pipe, three types of cold-

finished tube, two types of hollow bar, and two types of redraw hollow. Id. The Japanese

Producers do not dispute that the products selected were "relatively generic products" or

"standardized products." See Staff Report at V-22 to 23. Because the data provided in response

to the original solicitation were "sparse," however, the Commission expanded the definitions of

the products by increasing the acceptable range of average wall thicknesses and, for each redraw

hollow product, increased the acceptable range of outside diameters. See id. at V-7. The

Commission notes, and the Japanese Producers do not deny, that "Sumitomo was given the

opportunity to comment on the questionnaires and thus had the chance to propose other pricing

products," and that it "specifically asked for four additional pricing products [but] Sumitomo

provided only refinements to the pricing products proposed in the draft questionnaires." The

Staff Report indicates that the Commission received useable pricing data from ten U.S.

producers, thirteen importers, and fourteen purchasers, and calculated weighted-average prices

for each product. See id. at V-7, 9 to 22.

The Staff Report notes that the additional pricing data improved coverage moderately, but

characterizes the resulting pricing data coverage as still "relatively sparse . . . in part because of

the wide range of specification possibilities for CSSSHP" and because "a few of the domestic

producing firms specialize in less common CSSSHP specifications. For these firms, there was

little or no production of the relatively generic products for which pricing was obtained." Id. at

V-22. The Japanese Producers neither dispute the accuracy of these explanations for the paucity

of useable data, nor present any alternative method or data sample from which the Commission

could determine more accurately the extent of underselling.

Furthermore, recognizing the limited coverage of its data sample, the Commission sought to bolster its findings of underselling by checking pricing trends against another set of data. In the Remand Determination, the Commission indicated that its findings based on the data sample were consistent with its analysis of product groups, whereby it concluded that Japanese hollow products undersold U.S. hollow products "over the entire range of products in which they compete: in 34 of 51 observations for hot-finished hollows and 35 of 37 observations for cold-finished hollows." Remand Determination at 34 (citing Table E-3). Table E-3 compares "U.S. producers' U.S. shipments" to "U.S. shipments of imports," arranging the data for which by product categories. The Table does not reflect prices for individual sales, but the Commission noted that the data "reflect the steep decline in average unit values across a broad spectrum of products." Id. at 34 n.32. Thus, the Commission relied on product group pricing data in terms of average unit values as supplementary support of its analysis based on the sparse pricing data, rather than a substitute therefor.

Accordingly, the court finds that the Commission's use of pricing data for the nine selected products as defined was reasonable and supported by substantial evidence.


**B. Correlation between Underselling and Industry Performance**

In Altx I, the court indicated that "[e]vidence of consistent underselling that occurs while the domestic industry is performing favorably may reasonably undercut the significance attributed to underselling." 167 F. Supp. 2d at 1366 (citing Coalition for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 15 F. Supp. 2d 918, 925 (Ct. Int'l Trade

1998)).  The court remanded on this issue, however, as the Commission did not adequately evaluate, inter alia, the Plaintiffs' argument that the Commission's use of yearly data may have masked the true health of the domestic industry.  Id.

The court finds that the new Commission majority similarly failed to address the relevant and material arguments made by the Japanese Producers.  See Statement of Administrative Action, accompanying H.R. Rep. No. 103-826(I), at 892, reprinted in 1994 U.S.C.C.A.N. 4040, 4216 ("SAA") (under 19 U.S.C. § 1677f(i), "the agencies must specifically reference in their determinations factors and arguments that are material and relevant, or must provide a discussion or explanation in the determination that renders evident the agency's treatment of a factor or argument.").

In the Remand Determination, the Commission described its underselling findings as follows:

> In 1997, the Japanese hot-finished stainless hollow products undersold the domestic like product in 7 of 13 instances.  However, in 1998 (when the increase in the volume of subject imports was the greatest) and in 1999, the Japanese product undersold the domestic product in 25 of 31 instances.  In the first quarter of 2000, after the petition was filed and prices for the Japanese product increased, the degree of underselling decreased.  With respect to cold-finished CSSSHP, prices for both U.S.-produced and Japanese CSSSHP declined over the period, and reached low points in 1999.  In 31 of 39 instances in which the prices of cold-finished CSSSHP produced in the United States and in Japan could be compared, the Japanese product undersold the domestic like product.

Remand Determination at 33.  Japanese Producers claim that even if the use of the data sample were proper, the Commission did not address their argument that the pricing data do not demonstrate a correlation between underselling and the condition of the domestic industry.  The Japanese Producers maintain that the Commission found that the frequency of underselling was

high in 1998, but ignored that the domestic injury had a "banner year" in 1998, while 1999 showed a similar frequency of underselling but diminished performance from the previous year.

The Commission does not assert that it attempted to correlate underselling with market indicators specified by the Japanese Producers. Rather, the Commission responds that the court in Altx I stated that "the significance of underselling . . . depends on the particulars of the product and industry at issue," and that, given the sparse data, the fact that underselling occurred in "so many of available comparisons" is itself significant. ITC Br. at 24-25. The court finds the Commission's reasons for its failure to examine whether its findings of underselling correlate to trends in the health of the industry are inadequate.[18]

That there was frequent underselling during the POI does not necessarily mean that underselling was the source of injury. The overall frequency of underselling by itself says nothing about causation, and does not absolve the Commission of its obligation to analyze underselling in terms of trends in the domestic industry's performance. See Altx I, 167 F. Supp. 2d at 1366 ("Section 1677(7)(C)(ii) requires the Commission to undertake two distinct analyses to examine (1) the significance of underselling and (2) the causal connection between subject imports and price depression and/or suppression."). Naturally, a finding that U.S. market indicators were improving in periods of intense and/or consistent underselling may undermine a finding that subject imports caused injury to the domestic industry. See id. (citing Coalition, 15 F. Supp. 2d at 925). Conversely, deteriorating domestic performance in the face of intense

_____

[18] The Domestic Producers state that the Commission found that the domestic industry "suffered intense difficulties in the second half of 1998 and the first half of 1999," which is when the Commission found that subject imports' underselling was the greatest and their prices were lowest. The Commission, however, made no findings with respect to incidence of underselling on a semi-annual basis that would reveal such a correlation.

underselling tends to support a determination of a causal connection.  Therefore, the Commission

must attempt to track its yearly (or more frequent) data on underselling to yearly (or more

frequent) data on health indicators of the domestic industry.

**C. Price Depression and Suppression**

The Commission found that "the persistent underselling and aggressive pricing" and the

"declining domestic prices during the period examined" demonstrated that the high volume of

subject imports suppressed and depressed domestic prices.  Remand Determination at 34-35.

Japanese Producers claim that the data do not show price depression or suppression because:  (1)

there is no evidence of a causal connection between domestic prices and subject import prices;

and (2) the record evidence belies the ITC's conclusions of Japanese price leadership.

1. Correlation between Subject Import Prices and Domestic Prices

The new Commission majority found that prices for both the domestic like product and

the subject imports "generally fell" over the POI.  The Remand Determination then indicates that

domestic prices of hot-finished CSSSHP – namely, ASTM A-312 pipe (products 1 and 2),

hollow bars (products 6 and 7), and redraw hollows (products 8 and 9 –  "declined irregularly,"

and notes a "similar trend" for Japanese prices, "although with a more distinct upturn in the first

quarter of 2000, following the filing of the petition." Remand Determination at 32.  The

Commission did not specify pricing trends for cold-finished tube (products 4 and 5).[19]

_____

[19] The Commission's findings are generally consistent with the Staff Report's explanation
of pricing trends:

In general, the prices for the products examined fell over the period at issue,
although not necessarily by the same amount for all products.  Additionally, prices
of CSSSHP imported from Japan fell slightly more than those for U.S.-produced

(continued...)

The Japanese Producers first argue that the Commission found decreased underselling in the first quarter of 2000, but also found that domestic prices did not recover in early 2000. The court finds no disconnect in the Commission's findings as the Japanese Producers allege. As underselling was still found to be occurring in the first quarter of 2000, regardless of any change in the incidence thereof, it is not inconsistent that the domestic pricing did not show signs of recovery in this period.

The Japanese Producers next claim that the data on a product-by-product basis is not conclusive. They allege that domestic pricing for products 1, 2, 3 and 5 either remained constant while Japanese pricing changed significantly, or fluctuated over the POI in a manner inconsistent with fluctuations in Japanese pricing. They do not address changes in pricing for the other products. The Japanese Producers concede that the data for products 3, 4, 5 and 9 generally shows underselling. Sumitomo Br. at 23 n.21. For the remainder of the products, however, they contend that there was either more prevalent overselling (products 2, 7 and 8) or insignificant underselling (product 5). Id.

The Commission responds that "the fact that some overselling exists and that pricing anomalies can be gleaned from the various pricing series does not undermine the general correlation between the domestic pricing declines and the declining prices of Japanese CSSSHP. It is true that the Commission need not find an exact correlation between subject import pricing

---

[19](...continued)
product during this time. There is broad (but not universal) price underselling on the part of Japanese products, at margins of up to about [          ] in some cases.

Staff Report at V-24 (note omitted).

and domestic pricing.  Nevertheless, the Commission's cursory look at general net declines over the POI  is insufficient.  Where the decline in pricing is admittedly "irregular," the Commission must track domestic pricing with subject import pricing on a year-to-year basis, if not on a semi-annual or quarterly basis, depending on the availability of data.  Therefore, on remand, the Commission shall reevaluate its findings with respect to price correlation in light of the concerns raised by the Japanese Producers.

    2.  Price Leadership

The Japanese Producers maintain that the Commission's finding that "several [firms] identified Sanyo and Sumitomo as price leaders" is misleading, as the Staff Report, read in context reveals contradictory evidence regarding price leadership.  The Staff Report reads in pertinent part as follows:

> Some firms suggested that there are really no price leaders in the market for CSSSHP. . . . Other firms suggest that price leadership exists, but is diffused among several of the largest firms, including Sandvik, Sumitomo Metal, Tubacex, DMV, Sanyo, and others. . . . A third view is that only the strongest of these firms are true price leaders.  In this context, Sandvik is often mentioned, especially over the period examined.

Staff Report at II-10.

While the Commission "may not . . .  ignore a Staff Report analysis that contradicts [its own]" which is relied upon by the parties, Altx I , 167 F. Supp. 2d at 1359-60, it is within its discretion to choose which is the most credible among conflicting testimony.  Its decision to cite the Japanese leaders is understandable, given the evidence relating to Japanese pricing as generally lower than domestic pricing.[20]  Further, the Commission did not state that other firms

---

[20] The Japanese Producers assert that the Commission ignored testimony producers of

(continued...)

were <u>not</u> price leaders, only that Sumitomo and Sanyo were identified as price leaders. The producers of subject imports need not be found to be the only recognized price leaders to support a finding of price suppression and/or depression. The court finds that although the Commission's phraseology was somewhat misleading, there is insufficient reason to reject the Commission's conclusion.

**D. Alternative Causes for Decline in U.S. Pricing:   Declining Input Costs**

The Japanese Producers maintain that the Commission lacked a proper basis for dismissing their argument that the decline in hollow products pricing is more properly attributed to the decline in input prices. On remand, the Commission recognized that "input costs are an important component of price," but found that while the price of nickel dropped in 1997 and 1998, and "completely reversed in 1999 and early 2000," domestic prices continued to decline "for virtually all grades and types of CSSSHP . . . and did not recover." Remand Determination at 33-34. The Commission further found that price declines in the U.S. market "outpaced" cost savings for the majority of the domestic industry not benefitting "extensively" from the purchase of Japanese imports. <u>Id.</u> at 34. The Commission also noted that "[t]he most significant decline in billet and bar prices appear to have taken place in 1997," and that "[w]hile redraw hollow

---

[20](...continued)
non-subject imports were in fact price leaders rather than Japanese producers. They further assert that the Commission's reliance on the Staff Report's finding that "Japanese pricing is generally lower than domestic pricing" omits that the Staff Report also indicated that "[s]ome of the purchasers that discuss Japanese pricing are quick to note that non-subject pricing is generally lower than domestic pricing, and is competitive or more competitive than Japanese." Staff Report at II-28 & n.52. The fact that some purchasers consider certain producers of non-subject imports to be price leaders or consider non-subject pricing generally lower than domestic pricing does not negate the Commission's analysis of the data showing consistently lower valued Japanese CSSSHP, nor does it negate the fact that several Japanese producers were also named as price leaders.

prices declined throughout most of the period examined, we find that this reflects in large part

the increasing volume and share, and declining average unit values, of imports of the subject

merchandise from Japan." Id. at n.28.[21]

The Japanese Producers first claim there is a continuing input cost / price relationship

throughout 1999 for input (bar) costs.[22] The Japanese Producers also claim that the Commission

ignored evidence that: (1) factoring in lag times, the pricing data generally show a close

correlation between domestic prices, prices for feedstock (bars), and raw material prices; (2)

questionnaire responses "confirm" that raw material and feedstock prices are the predominant

cause for changes in domestic prices; and (3) Sandvik documents indicate that its prices declined

due to lower nickel and alloy prices.

First, the Commission noted a lack of correlation between domestic pricing and the cost

of nickel, rather than feedstock (bars). Second, the Commission did not find that declining input

costs had no effect on domestic pricing. Rather, the Commission found that the price declines

were greater than any cost savings, and therefore subject imports could not be ruled out as a

material factor of declining domestic prices. The Japanese Producers do not dispute the

Commission's finding with respect to the extent of pricing declines in relation to cost savings. In

the absence of any evidence proffered by the Japanese Producers that price declines did not in

---

[21] The Commission also found that "the domestic industry's superior delivery times do not offset other advantages generally attributed by purchasers to CSSSHP from Japan (primarily price, followed by product range)." Remand Determination at 34 (citing Staff Report at Tables II-2 and II-3). The Japanese Producers do not contest this finding.

[22] Specifically, the Japanese Producers assert that [
] correspond to "little rise" in domestic prices after 1998, which contradicts the Commission's finding that domestic prices "did not recover" at the end of the POI although input prices increased in 1999. Remand Determination at 34.

fact outpace cost savings from declining input prices, the court finds that the Commission's

properly ruled out declining input costs as a predominant cause of injury.

## III. Impact: Correlation between subject import volumes and the performance of the domestic industry

The court in Altx I directed the original Commission majority to reevaluate its finding of

a lack of a correlation between the domestic industry's performance with trends in subject import

volume. 167 F. Supp. 2d at 1358.[23] On remand, the new Commission majority recognized

various trends that were inconsistent with a finding that subject import volume correlated with

domestic performance, but discounted each inconsistency based on other financial indicators.

First, the Commission found that domestic production rose between 1997 and 1998, fell in 1999,

then recovered in the first quarter of 2000. Remand Determination at 35. As subject import

volume increased from 1997 to 1998 and dropped in 1999, the Commission explained this

apparent inconsistency by attributing the increase in production level to the "combined effects of

increased exports and inventory levels." Id. Second, the Commission recognized that "full fiscal

year gross profits and operating income crested in 1998," but attributed this to declining costs

(raw material direct labor, and factory overhead) and expenses over the POI. Id. at 36. Third, the

Commission recognized that operating income on a unit basis and as a ratio to sales were higher

---

[23] Specifically, the court ordered the Commission to respond to Plaintiffs' arguments that:
(1) the domestic industry's strong performance was attributable to [          ] by domestic
producers; (2) that the effect of subject import purchases would not be realized until the
following year because in a market with shrinking consumption, merchandise is consumed more
slowly as stocks last longer; and (3) the Commission ignored the results of its own econometric
analysis, which showed that subject imports resulted in reduced output by the domestic industry.
Id.

in 1999 than in 1997, but found that this increase "reflect[s] the increasing proportion of total

sales accounted for by the higher-value cold-finished stainless steel hollow products." Id. at

n.41. That is, the Commission apparently discounted the spike in the domestic industry's overall

operating income in 1998 on the basis that the consistently rising operating income attributable to

cold-finished CSSSHP outstripped that of hot-finished CSSSHP.

The Commission then analyzed net changes from 1997 to 1999 in domestic performance

indicators, including production, capacity utilization, and domestic shipments.[24] Finally, the

Commission considered domestic performance in relation to subject import volume on a semi-

annual basis for 1998 and the first half of 1999.

The Japanese Producers contest the new Commission majority's impact determination on

the following grounds: (1) the Commission erred in relying on semi-annual data; (2) there is no

correlation between the volume of subject imports and the condition of the domestic industry, for

either the semi-annual or the annual data. The Japanese Producers also claim that the

Commission ignored the effect of the bankruptcy of ALTech on industry performance, as well as

the benefits of subject imports to the domestic industry and the impact of related party

transactions.

**A. Use of Semi-Annual Data**

After analyzing the domestic industry's performance for the period 1997-1999, the

---

[24] The Commission determined that U.S. performance declined according to several indicators during this period. For example, the Commission states that over this time period, production fell by 11.4 percent, capacity utilization decreased by 3.9 percentage points, and domestic shipments decreased by 16.8 percent by quantity (19.6 percent by value). Remand Determination at 36 (citing Staff Report at Table III-2). The Commission noted that the decline in domestic shipments occurred while U.S. consumption increased by 10.9 percent and subject imports increased by 26.8 percent. Id.

Commission stated that "a more detailed performance evaluation indicates that the domestic industry's difficulties were most intense in the second half of 1998 and the first half of 1999, when the subject imports held a [substantial percentage] of the U.S. market."[25]  Id. at 37.  The Commission recognized that in the first half of 1998 domestic operating performance was "strong" even though the volume of subject imports was high.  Id.  Nevertheless, this apparent inconsistency was attributed to a "steep decline in the unit cost of goods sold ['COGS']."  Id.  The Commission also found that domestic performance in the last half of 1998 declined in terms of domestic shipments and profitability, while subject imports "surged" 33.3 percent.  Id.  The Commission recognized that subject imports decreased from the second half of 1998 to the first half of 1999, but found that this was not inconsistent with declines in U.S. producers' domestic shipments, revenue and profitability because subject imports "remained at high levels." Id. at 38. Lastly, the Commission noted a decrease in subject imports from the first half of 1999 to the second half of 1999, which coincided with an improvement in the domestic industry's performance (in terms of domestic shipments and operating income) that continued into the first quarter of 2000.  Id. at n.53.

The Japanese Producers claim that the Commission's method of analyzing the data on a semi-annual basis for 1998 and the first half of 1999 is contrary to law because in order to comply with its obligation to investigate present injury, the Commission must look at trends in

---

[25]  For support of its characterization of the domestic industry's difficulties as "intense," the Commission cites to hearing testimony from a former ALTech employee attributing the financial difficulties  The Commission also cites to bi-annual data in Table C-6 of the Staff Report, which show that the market share of Japanese imports were as follows: 29.5% first half of 1998; 40.2 % in the second half of 1998; 30.7% in the first half of 1999; and 22.9% in the second half of 1999.

the U.S. industry performance and imports over the entire three year plus partial year period for which data are available.  The Japanese Producers focus particularly on the last half of 1999, which they argue shows that any injury by subject imports "disappeared" and therefore the Commission would be obligated to find no injury as a matter of law.  The Japanese Producers further assert that, as the Commission sought other injury-related data (for example, data related to competitive overlap) only on a calendar year basis, the data it did collect for the period July 1, 1998 to June 30, 1999 are too limited to rely upon in making an overall injury determination.

It is apparent, however, that the Commission sought to address the inconsistencies suggested by its analysis of the 1997-1999 data by analyzing semi-annual data.   The Commission was under no obligation to perform this supplementary analysis for the entire POI. See Companhia Paulista de Ferro-Ligas v. United States, 20 CIT 473, 483 (1996) (Commission may weigh evidence from different time periods and determine which is more probative) (citation omitted).  Although the Commission is under an obligation to respond to a party's reasonable arguments regarding apparent inconsistencies in the data and the conclusions drawn therefrom, the Commission is not under an obligation to retract from a more detailed analysis to shoehorn the data into groupings that comport with a differing interpretation of the data.

The Japanese Producers further argue that the Commission fails to account for the fact that semi-annual data for three U.S. producers operations are incomplete.  The original Commission majority had discounted the semi-annual data as not comparable to the annual data due to the absence of semi-annual data from three domestic producers.  See Altx I, 167 F. Supp. 2d at 1371.  The court in Altx I specifically rejected its proffered reason on the ground that the three producers that did not provide semi-annual data represented a relatively small portion of the

domestic production for 1999.   Id.

The court finds, therefore, that the Commission did not err in relying on semi-annual data to supplement its analysis of domestic performance in relation to subject import volume.

## B.  Support for the Commission's Positive Correlation Finding

The Japanese Producers claim that the Commission ignored the following trends that undermine the Commission's determination that subject import volume is significant, and otherwise belie a correlation between injury and subject imports:  (1)  from 1997 to 1998, the domestic industry's performance (in terms of production, profit, cash flow, productivity, and wage rates) improved notwithstanding a rise in imports; and (2) in 1999, the domestic industry returned to 1997 levels, while imports decreased.   The Commission responds that "neither gross profit nor operating income was strong throughout the POI," as "full fiscal year gross profit and operating income crested in 1998, but were lower in 1999 than in 1997." ITC Br. at 32.   Thus, the Commission's argument relies on the net decrease in gross profit and operating income over the POI to show an industry in decline.

That the Commission may rely on semi-annual data for a select period as part of its impact analysis is not to say that the Commission may disregard trends over the entire POI, or that its conclusions drawn from the semi-annual data are necessarily supported by substantial evidence.  Because a correlation analysis necessarily entails a tracking of trends in subject import volume in relation to trends in the domestic industry's performance, the Commission should not rely solely on the net change in subject import volume performance indicators over the POI when year-to-year data is available.  This is especially true in this case, where 1998 showed dramatic fluctuations in subject import volume and in several of the domestic industry's performance

indicators.[26]

In this case, the Commission did evaluate domestic production, gross profits and operating income on a year-to-year basis. The Commission did not evaluate any other of the "relevant economic factors" on such a basis. See 19 U.S.C. § 1677 (the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry," including the following: output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, and research and development). Nevertheless, remand is not necessary on this issue because the Japanese Producers have not attempted to refute the Commission's explanations for the apparent inconsistencies in the data it did analyze on an annual basis.

## C. The Effect of ALTech's Bankruptcy on Domestic Performance Indicators

The Japanese Producers claim the Commission ignored the effects of the bankruptcy of

---

[26] The Staff Report indicates that market activity in 1998 substantially deviated from that in 1997 and 1999. (Quantities are expressed in short tons, while values are expressed in 1,000 dollars.).

[

]

Staff Report at C-4.

ALTech on the industry.[27]  Specifically, the Japanese Producers assert that the ALTech

bankruptcy:   (1) tempered the operating results of the domestic industry; (2) explains the net

decline in U.S. industry production levels from 1997 to 1999; (3) resulted in the bulk of

production jobs lost over the POI.  The Japanese Producers contend that the decline in ALTech's

operations had a material impact on the aggregate injury data.[28]  The Japanese Producers contend

that the 1997-1998 rise in redraw hollows can in part be attributed to ALTech's bankruptcy.

The Japanese Producers allege that when the effects of the ALTech bankruptcy are removed from

the analysis, domestic CSSSHP production actually rises, albeit slightly, between 1997 and

1999.]  Sumitomo Post-Hearing Br. at 3.

The Commission maintains that it was not obligated to adjust the data to account for the

bankruptcy of ALTech because it must evaluate the domestic industry "as a whole," and, in any

event, the ALTech bankruptcy was caused in part by Japanese imports.  It is true that the

Commission must evaluate the domestic industry as a whole.  See Acciai Speciali Terni, S.p.A.

---

[27]  The Japanese Producers describe the chronology of events related to the bankruptcy of ALTech as follows:   (1) ALTech was purchased in 1994 by Sammi Steel of Korea; (2) Sammi Steel declared bankruptcy in 1997, followed by a Sammi affiliate, Atlas Steel, which supplied ALTech with its billet; (3) in 1997, ALTech's workforce staged a strike and Atlas Steel sued ALTech for $41 million in unpaid bills; (4) by the end of 1997, ALTech declared bankruptcy, but continued operations,  [                    ]; (5) in 1999, ALTech's assets and manufacturing facility were bought by Tubacex, the parent company of Salem, a producer of cold-finished CSSSHP; (6) operations resumed as ALTX, Inc., one of the plaintiffs in the present action. ALTech was the only domestic producer to produce both hot- and cold-finished product during the POI.  Staff Report at I-10 & n.14.  Plaintiffs stress that ALTech was in operation during its bankruptcy, producing and selling "significant quantities of CSSSHP during 1998."  Def. Int. Br. at 9 (citing Staff Report at III-4, 5; Table III-2).

[28] The Japanese Producers specify that [

].

v. United States, 19 CIT 1051, 1063-64 (1995).  Evaluating the domestic industry "as a whole,"

however, is not a license to ignore information that would give context and meaning to the data it

is analyzing in assessing the domestic industry's performance.   Indeed, the statutory directive to

analyze the industry "as a whole" compels an evaluation of all material factors raised by the

parties that would render a more accurate reading of the health of the industry.  Therefore, if the

Commission determines to discount a particular factor that bears on the relevant financial

indicators, it must give substantial evidence to support its reasoning.  The court finds that the

Commission has failed to do so.

The Commission indicates that the Remand Determination cited testimony by a former

ALTech employee that "ALTech began losing significant accounts to subject imports and was

eventually forced to cease production."  Remand Determination at 37 n.43 (citing Hearing Tr. at

26 (Mr. Peak)).  The Commission points to no other facts on the record that would support Mr.

Peak's perception of the cause of ALTech's financial troubles, and fails to address evidence that

may contradict it, e.g., the ongoing disputes with labor.  Citation to testimony reflecting the

opinion of a former employee, without more, does not constitute an analysis of whether the

ALTech bankruptcy was in fact caused by subject imports, much less an adequate treatment of

the Japanese Producers' contentions regarding its effect on performance indicators.  Therefore,

the Commission shall reevaluate its determination as to the impact of subject imports on the

domestic industry by taking into consideration the effects of the bankruptcy of ALTech.


**IV. Alternative Causation:  Non-Subject Imports**

The court in Taiwan Semiconductor, 59 F. Supp. 2d at 1329-31, held that "the

Commission must not attribute the harmful effects from other sources of injury to the subject imports and must adequately explain how it ensured not doing so." See also SAA at 851-52 (Commission must "ensure that it is not attributing injury from other sources to the subject imports."). In Altx I, the court explained that the Commission need not establish a causal link between an alternative source of injury, such as non-subject imports, and the impact on the domestic industry. Nevertheless, the court cautioned that "a positive correlation concerning non-subject import volumes, in conjunction with other factors, may be sufficient to cut the causal link between subject imports and any harm suffered by the domestic industry." Altx I, 167 F. Supp. 2d at 1361-63. The court indicated that the original Commission majority provided sufficient proof to support its conclusion that non-subject imports displaced both subject imports and the domestic like product for the period 1998-1999. The court found, however, that the original majority failed to consider that its reasoning as applied to 1997-1998 would lead to an opposite conclusion, namely, that subject imports displaced both non-subject imports and the domestic like product. Consequently, the court instructed the Commission to reevaluate its assessment of displacement by non-subject imports in light of data for the entire POI.

On remand, the new Commission majority discounted the significance of non-subject imports on the following grounds: (1) the increase in the volume of imports of the subject merchandise from Japan was more rapid than that of non-subject imports; (2) the average unit values per short ton of non-subject CSSSHP remained "substantially higher" than those of the hot-finished and cold-finished CSSSHP from Japan; and (3) "[A] large volume of the non-subject imports do not appear to compete directly with U.S. production." Remand Determination

at 38 n.54 (citing Staff Report at Table IV-4; Table III-5 and Table E-4).[29]  The Japanese

Producers claim that the Commission either mischaracterizes or ignores the importance of non-

subject imports in terms of volume, price effects, and impact on the domestic industry.

## A.  Volume

The Japanese Producers contend that the Commission ignored its argument that the

higher aggregate volume of non-subject imports, and specifically the 1998-1999 "jump" in non-

subject imports while the domestic industry was "weakening," point to a causal relationship

between injury and non-subject imports sufficient to cut the causal link between subject imports

and injury to the domestic industry.  The court finds that the Commission's reliance on the

comparative rate of increase in volume is insufficient to discount the role of non-subject imports

for the purpose of analyzing present material injury determination.

Although there is nothing to prohibit the rate of increase (i.e., acceleration) in volume

from being a factor in its analysis, the comparative rate of increase in volume by itself is not a

reliable indicator of whether non-subject imports "may have such a predominant effect in

producing the harm as to  . . . prevent the [subject] imports from being a material factor."

Nippon at 479  (citing Taiwan Semiconductor, 59 F. Supp. 2d at 1329).  Surely, the Commission

---

[29] The Commission asserts that it analyzed the importance of non-subject imports by citing the following data:  (1) subject imports increased by 26.8 percent from 1997-99, while non-subject imports increased by 23.8 percent during that time; (2)  non-subject imports held [    ] percent of the market, [      ] percent in 1998, and [      ] percent in 1999; (3) non-subject market share increased by 4.9 percentage points over the period, and was 18.8 percentage points higher in the first quarter of 2000 as compared to the first quarter of 1999; (4) the market share of subject imports increased by 13.5 percentage points from 1997-1998, then retreated by 10.1 percentage points in 1999, such that there was a gain of 3.4 percentage points over the period examined, and was 21.1 percentage points lower in the first quarter of 2000 than in the first quarter of 1999.

would not be barred from finding subject import volume significant simply because volume

levels were <u>decelerating</u>, or not accelerating as fast as domestic shipments or non-subject

imports.  To the extent the Commission considers the non-subject imports' slower rate of

increase to negate the acknowledged fact that non-subject imports occupied a higher market

share than subject imports at all times during the POI, and captured a larger portion of the

domestic industry's market share, the court rejects such flawed reasoning.  <u>See</u> Staff Report at

C-4.  Nor is it clear why subject import's faster rate of increase eclipses the larger <u>absolute</u>

increase by non-subject imports.  It may be that the increase in non-subject import volume is less

significant than that of subject imports if non-subject volume increases were primarily in product

types that the U.S. industry either does not produce to any significant extent, but the Commission

is silent on the issue of tracking subject and non-subject import volume in terms of areas of no,

or at least no viable, domestic competition.

     The Japanese Producers also maintain that the data relied upon by the Commission in fact

shows that imports from Japan are a substitute for non-subject imports, rather than U.S.

production, and contradicts the Commission's characterization of "limited competition" between

non-subject imports and domestic production.[30]  The court finds an apparent inconsistency in the

---

[30] The court notes that for hot-finished CSSSHP, the product types in which the domestic industry production is concentrated generally correlate to those product types in which both Japanese and non-subject imports are also concentrated.  The court notes a similar concentration for cold-finished CSSSHP. Table E-4 shows that the hot-finished products in which domestic industry concentrates production include:  [

], both of which are also produced by Japan and other sources, [
     ].  The domestic industry also produces cold-finished CSSSHP in the following categories:  [
], some of which are produced in larger quantities by Japan and others from third-country

(continued...)

Commission's assessment of domestic like product competition with subject imports and with

non-subject imports.   The Commission claims that its finding that "[a] large volume of the non-

subject imports do not appear to compete directly with U.S. production" is supported by Table E-

4 which shows that "there are 23 categories in which there were non-subject imports shipped to

the United States in 1999, but little or no domestic production, comprising [     ] short tons, or [

  ], of all non-subject CSSSHP that was shipped in that year," which it considered to be a

"substantial volume" of non-subject imports that did not compete directly with the domestic like

product.   ITC Br.  at 34.   The court recognizes that it is within the agency's discretion to assess

the substantiality of the percentage of non-subject import volume not competing with the

domestic product.   Nevertheless, it is not clear why a similar percentage (approximately 20%) of

subject imports not produced by the domestic industry supported the opposite conclusion in

determining the significance of subject import volume.[31]   The Commission shall address this

---

[30](...continued)
sources.

In addition, Table I-1 shows that domestic and Japanese production is  mainly in the >1-1/4" and < 3" size range, and CSSSHP from all other sources is concentrated in the >3" range. The reliability of this data is questionable, however, as it does not reflect the size breakdown of the market described in section I and reflecting the domestic industry's lack of viability in sizes between 3" and 8".  Arranged by product type, however, the data show that Japanese and non-subject imports appear to compete more directly with each other than with the domestic industry: both concentrate production in A312 pipe, while domestic production is concentrated in redraw hollows.

[31] Table I-2 of the Staff Report indicates the range of imports not available from U.S. producers expressed as a percentage of total imports. These figures are as follows:

|  | Japan | | | Other Sources | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 1997 | 1998 | 1999 | 1997 | 1998 | 1999 |
| Hot | 18.3 | 24.8 | 25.3 | 24.9 | 14.3 | 21.0 |
| Cold | 2.8 | 6.9 | 7.8 | 0.7 | 1.0 | 0.6 |
| Total CSSSHP | 11.0 | 19.0 | 18.7 | 16.2 | 9.0 | 13.8 |

inconsistency on remand.

In further support of its conclusion, the Commission at oral argument directed the court's attention to the section of Table I-1 of the Staff Report ("U.S. shipments of domestically produced and imported products, by sizes and types) that shows U.S. shipments of hot-finished CSSSHP arranged by size. This section of Table I-1 shows that both U.S. and Japanese production of hot-finished CSSSHP is concentrated in the 1-1/4" to 3" O.D. range, while non-subject imports are concentrated in the 3" and higher range.[32] Although the size ranges do not match the size ranges discussed above in terms of the viability of domestic production, see section I.B supra, this proportionality generally supports the Commission's conclusion that non-subject imports compete less directly with U.S. producers than do subject imports. The court notes, however, that to the extent conclusions about competition overall may be drawn from the proportionality in U.S. shipments of hot-finished CSSSHP alone, the figures for hot-finished CSSSHP disaggregated by type apparently support the opposite conclusion.[33] Nor do the figures for total CSSSHP show a proportionality similar to that of hot-finished CSSSHP arranged by size, which may or may not be accounted for by the large percentage of unreported subject

---

[32] Specifically, Table I-1 shows that [      ] of U.S. produced hot-finished CSSSHP is in the 1-1/4" to 3" O.D. range, and [      ] of Japanese hot-finished CSSSHP, in contrast to [      ] of non-subject imports.

[33] Staff Report at Table I-1 show that U.S. shipments of hot-finished CSSSHP are concentrated in the redraw hollows – [      ] of U.S. production – in comparison to [      ] and [      ] for subject imports and non-subject imports, respectively. In contrast, subject and non-subject imports are concentrated primarily in A-312 pipe – [      ] respectively and [      ], respectively, in comparison to [      ] of U.S. production.

imports of cold-finished CSSSHP disaggregated by size-range. [34]   Therefore, the court finds the

data in Table I-1 facially too mixed to serve independently as a basis for discerning the

Commission's reasoning for the CSSSHP market overall.  On remand, the Commission may

choose to explain to the court how Table I-1 supports its conclusion that non-subject imports do

not compete directly with domestic production.

## B.  Price

The Japanese Producers maintain that the average unit values for all imports are

misleading as a means to discount the importance of non-subject imports because the average

values of subject and non-subject imports "are not comparable because of differences in product

mix."  The Japanese Producers' argument lacks merit.  The Commission may rely on a

comparison of average unit values to determine whether non-subject imports can be discounted

as the predominant cause of injury, although such a comparison would be questionable at best if

applied to a determination of the subject imports' price effects on the domestic industry under 19

U.S.C. § 1677(7)(C).  The court finds that the Commission is correct that Table IV-4 supports its

finding that subject imports are lower-valued than non-subject imports, as Table IV-4 shows that

in every year of the POI, the Japanese Producers show consistently lower aggregate unit values

for both hot- and cold-finished CSSSHP.  Table E arranges imports by product group, and shows

---

[34]  Staff Report at Table I-1 shows that U.S. shipments of total CSSSHP are concentrated in the 1-1/4" to 3" range– [     ] of U.S. production –  in comparison to [     ] and [     ] for subject imports and non-subject imports, respectively.   In contrast, non-subject imports are concentrated primarily in size ranges above 3" – [     ], while [     ] of subject imports are in this category, respectively, in comparison to [     ] of U.S. production. The proportionality with respect to subject imports may not be conclusive, however, because [     ] of subject imports of all CSSSHP were not reported in terms of size range, reflecting the high percentage – [     ] – of subject imports of cold-finished CSSSHP that were not reported.

that subject imports' unit values are indeed lower than that of non-subject imports in a majority of product-group comparisons of Japanese and non-subject imports' AUVs. Therefore, the Commission's isolated finding that Japanese pricing was lower than non-subject imports is supported by substantial evidence.

## C. Impact

Lastly, the Commission has not addressed the Japanese Producers' argument that the volume of non-subject imports correlates more closely with the performance of the domestic industry that the volume of subject imports. A close correlation between non-subject import volume and the performance of the domestic industry could support a determination that non-subject imports were a predominant factor in causing injury to the domestic injury, especially if the correlation with subject imports is not as clear. The Commission shall make such an evaluation on remand in a manner that avoids the problems discussed above.

## Conclusion

Accordingly, the court remands for the Commission to reevaluate subject import volume in terms of its findings of a limited competitive overlap, especially in light of its findings of attenuated competition with non-subject imports. The Commission shall also reevaluate its conclusions with respect to: (1) correlation between underselling and domestic industry performance; (2) correlation between subject import prices and domestic prices; (3) the effect of the bankruptcy of ALTech on domestic performance indicators; and (4) non-subject import volume and correlation thereof with domestic performance.

Remand results are due within 45 days hereof. Objections may be filed within 15 days and the response within 11 days thereafter.

_____

Jane A. Restani

JUDGE

Dated: New York, New York

This 12th day of July, 2002.

**ERRATA**


<u>ALTX v. United States</u>, Court No. 00-09-00477, Slip Op. 02-65, dated July 12, 2002.

 On page 2, five lines from the bottom, and in footnote 1, page 3, "Chairman Dennis M. Devaney" should read "Commissioner Dennis M. Devaney."

 On page 2, five lines from the bottom should read ". . . he was appointed after the issuance of the Commission's Final Determination," not "after the issuance of <u>Altx I</u>."